**No. 22-11226**

In the

# United States Court of Appeals

for the

# Fifth Circuit

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff – Appellee,*
v.
TIMOTHY BARTON,
*Defendant – Appellant.*

From the United States District Court
for the Northern District of Texas
Honorable Brantley Starr, U.S. District Judge
Cause No. 3:22-cv-2118-X

**RECEIVER'S MOTION TO BE RECOGNIZED AS THE APPELLEE OR AS A PARTY IN INTEREST, MOTION TO INTERVENE OR ALTERNATIVELY, MOTION FOR LEAVE TO FILE AMICUS BRIEF**

BROWN FOX PLLC
Charlene C. Koonce
State Bar No.11672850
8111 Preston Road, Suite 300
Dallas, TX 75225
T: (214) 327-5000
F: (214) 327-5001
charlene@brownfoxlaw.com
*Counsel for Receiver Cortney C. Thomas*

**RECEIVER'S MOTION TO BE RECOGNIZED AS THE APPELLEE OR AS A PARTY IN INTEREST, MOTION TO INTERVENE OR ALTERNATIVELY, MOTION FOR LEAVE TO FILE AMICUS BRIEF**

Cortney C. Thomas, the Court-appointed Receiver ("Receiver"), *as the only movant that requested the relief at issue in the order on appeal and the only party whose interests are prejudiced by this appeal***,** seeks amendment of the docket recognizing the Receiver as Appellee, recognition as a Party in Interest, alternatively requesting leave to intervene, or in the further alternative, leave to file an amicus brief. The Receiver seeks dismissal of this appeal for lack of jurisdiction, or alternatively, a judgment affirming the Order. The Receiver respectfully shows the Court as follows:

1. This appeal seeks the Court's review of one order issued solely based on a motion filed by the Receiver, Dkt. 104, Order Granting Motion to Approve Sale. (the "Order"). *See Notice of Appeal.*

2. The Order granted relief requested by the Receiver in his Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale (the "Motion"). (Dkt. 76). The Motion was required to comply with 28 U.S.C. § 2001 (the "Statute"), which governs sales of realty by receivers.

3. The Court set a hearing on December 19, 2022 to consider the sale (Dkt. 78) and required expedited briefing regarding the Motion.

4. Appellant Timothy Barton filed a Response and Objection to the Motion, (Dkt. 91), and the Receiver filed a supporting reply. (Dkt. 93).

5. Because the Receiver discovered Barton had interfered with the proposed sale by filing a Lis Pendens on the subject property (the "Rock Creek Property") immediately before the Motion was filed and in violation of the Receivership Order, the Receiver also filed a Verified Emergency Motion to Declare Lis Pendens Void. (Dkt. 96).

6. Shortly before the scheduled hearing, the Court granted the Motion in part, by appointing the appraisers identified in the Motion and approving their appraisals. (Dkt. 99).

7. *The SEC did not file anything related to the Motion because it was neither the movant, nor procedurally "interested" in the outcome***.**

8. On December 19, 2022, the Court conducted a lengthy hearing. Although the Court requested an oral statement from the SEC regarding its position on the Motion, the Receiver's counsel argued the Motion, while Mr. Barton's counsel responded. *See* Transcript attached to this Motion.

9. The Court orally granted the Motion at the hearing, and on December 20, 2022, entered a written order reflecting its ruling. (Dkt. 104). The Order also granted the Receiver's Verified Emergency Motion to Declare the Lis Pendens filed by Barton void.

10. On the next day, Barton filed his Notice of Interlocutory Appeal regarding the Order.

11. The Receiver should accordingly be designated as the Appellee and heard regarding Appellant's challenge to an Order granting relief requested by the Receiver.

12. Additionally, the Receiver is the only party prejudiced by the appeal, and therefore interested in challenging it. Because of the pending appeal, and because Barton again violated the Receivership Order by interfering with the sale and telling the buyer the Rock Creek Property was subject to flooding and foundation problems, the sale has been postponed. Dkt. 132, ¶¶ 28-29. Nonetheless, as discussed at the hearing and in the Receiver's Reply in Support of the Motion, (Dkt. 93), the loan on the Rock Creek Property continues to accrue interest—at 9.9% (unless the lender is successful in obtaining the default rate which is 18%)—and taxes. The Receiver cannot close the sale until and unless this appeal is resolved.

13. Adding insult to injury and reflected in the attached Motion, which the Receiver seeks leave to file as an amicus if he is not recognized as the Appellee, no interlocutory jurisdiction exists for this appeal. The Eleventh Circuit addressed the jurisdictional issue succinctly when comparing the scope of 28 U.S.C. §§ 1292(a)(2) and 1292(a)(1) which govern interlocutory appeals of temporary restraining orders and orders related to receiverships:

> "That provision [1292(a)(1)] more broadly confers jurisdiction over orders 'granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.' 28 U.S.C. § 1292(a)(1). It thereby expressly authorizes immediate appeals not only of front- and back-end orders 'granting,' 'refusing,' or 'dissolving' injunctions, but also of mid-stream orders 'continuing,' 'modifying,' or 'refusing to dissolve or modify' them. The contrast is unmistakable. Had Congress wanted to authorize the same robust interlocutory appellate review of interim receivership-related orders, it could have included similar language in § 1292(a)(2). It didn't, and its decision in that respect is 'telling.'"

*SEC v. Complete Bus. Sols. Group, Inc.*, 44 F.4th 1326, 1331–32 (11th Cir. 2022); *see also, US v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) ("Courts narrowly construe § 1292(a)(2) ("to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.") (internal quote omitted)); *see also Netsphere, Inc. v. Baron*, 799 F.3d 327, 331-32 (5th Cir. 2015) (every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing ... to take steps to accomplish the purposes of [winding up receiverships].'").

14. This appeal does not fall within any of the three designated categories of receivership orders for which interlocutory jurisdiction exists, and the Receiver requests leave to fully brief the absence of this Court's jurisdiction.

15. The Receiver conferred with Appellant regarding this Motion, and Appellant ignored the conferences.

16. The SEC is unopposed.

17. A copy of the Receiver's Motion to Dismiss, drafted solely by the Receiver's counsel, is attached to this Motion.

## ARGUMENT

Based on the terms of the Receivership Order, Dkt. 29**,** the Receiver holds all Receivership Property and is authorized, subject to further orders, to sell receivership property. *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019). His unique and sole interest is undisputed. Designating the Receiver as the appellee or otherwise as an interested party is therefore appropriate, particularly since the appeal addresses an Order issued solely on the Receiver's Motion.

Nor would including the Receiver be novel or inappropriate. For instance, Appeal No. 09-40641, *Crawford v. Sillette,* was docketed reflecting the Receiver as an interested party, although the underlying case clearly reflected the CFTC as the Plaintiff. An order obtained by the Receiver was at issue in the *Crawford* appeal. Similarly, in *Zacarias v. Stanford Int'l Bank, Ltd.*, Appeal No. 17-11073, and many other *Stanford*-related appeals, the receiver was identified in the docket as a ("null") appellee and permitted to file responsive motions and briefs. *See also Helt v. Sethi Petroleum, L.L.C.*, No. 20-40240, 2022 WL 127977, at *1 (5th Cir. Jan. 13, 2022)

(Designating Receiver, Helt, as the Appellee in SEC enforcement case involving interlocutory appeal of denial of motion to intervene by party who sought to challenge Receiver's authority over certain receivership entities as assets); *SEC v. Res. Dev. Intern.*, 291 Fed. Appx. 660, 661 (5th Cir. 2008) (case docketed reflecting Receiver as "Counter-Defendant Appellee" where order at issue, finding appellant in contempt, was issued based on receiver's motion).

A similar docketing practice was followed by the Seventh Circuit in *SEC v. Ventus Holdings*, Appeal No. 21-2664, where that Receiver was designated as "Court-Appointed Receiver-Appellee," while the SEC, the Plaintiff, was identified as the "Plaintiff-Appellee." In the *Ventus* appeal, the Receiver filed motions and briefs.

In the alternative, to the extent joinder or intervention rather than a docket correction is necessary,[1] the Receiver satisfies the standards for either. Rule 19 requires joinder of persons who "claim an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest." FED. R. CIV. P. 19(a)(1)(B)(ii). The Receiver easily satisfies this standard. *See Schutten*

[1] Correcting the docket to reflect the Receiver's *existing* inclusion in this matter does not require joinder. In an abundance of caution, however, in the event the Court concludes Rule 19 or Rule 24 govern, the Receiver satisfies both rule's standards.

*v. Shell Oil Co.*, 421 F.2d 869, 874 (5th Cir. 1970) (considering prejudice, from a pragmatic perspective, to interested person not joined). The SEC does not represent the Receivership Estate's interest and suffers no loss with respect to the Order at issue.

Similarly, the Receiver satisfies the standards for intervention, which require only (1) a timely application; (2) the applicant's interest relating to the property or transaction that is the subject of the action; (3) disposition of the action may, from a practical perspective, impair or impede the applicant's ability to protect his interest; and (4) the applicant's interest are not adequately represented by the existing parties. *Texas v. U.S.*, 805 F.3d 653, 657 (5th Cir. 2015). *See* FED. R. CIV. P. 24(a). Courts liberally construe the four factors governing intervention, to "allow intervention where no one would be hurt and the greater justice could be attained." *Id.* at 656-67 (quotations omitted). Here, no one is harmed by the Receiver's inclusion in this appeal, but his absence potentially harms the investors whose interests he serves in having obtained the order that is being appealed.

## CONCLUSION

The Receiver is *the only* proper Appellee based on the appeal of an order granting a motion filed by the Receiver, in which the SEC did not participate. Further, the pendency of the appeal is and will continue to cause prejudice to the Receivership Estate by precluding sale of the property as authorized by the District

Court, particularly since no appellate jurisdiction exists to consider the Order. Accordingly, the Receiver should be named as an Appellee, a Party in Interest, an Intervenor, or alternatively, permitted to file the attached motion as an amicus.

Respectfully submitted,

By: */s/ Charlene C. Koonce*

Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

## CERTIFICATE OF CONFERENCE

I certify that as counsel for the Receiver, I conferred with Appellant's counsel regarding the relief requested in this Motion. First, on January 12, 2020, I emailed Appellant's counsel and asked whether they would agree to a request that this Court revise the docket to reflect the Receiver as the Appellee in this, and another appeal, in which the only order on appeal was entered on a motion filed by the Receiver. Counsel ignored the email. Again, on January 20, 2023, following email exchanges with Appellant's counsel on January 19, 2023 and earlier in the day on January 20, 2023 regarding other receivership issues, I again emailed Defendant's counsel to confer about this motion. No response was received.

*/s/ Charlene Koonce*
Charlene Koonce

## CERTIFICATE OF COMPLIANCE

1. I certify that this Motion complies with the type-volume limit of FED. R. APP. P. 21(d) because, excluding the words that need not be counted, it contains 1,633 words.

2. This Motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 365 in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

*/s/ Charlene Koonce*
Charlene Koonce

## CERTIFICATE UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I certify that (1) required privacy redactions have been made (see Local Rule 25.2.13); (2) the electronic submission is an exact copy of the paper document (*see* Local Rule 25.2.1); and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Charlene Koonce*
Charlene Koonce

# TRANSCRIPT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CASE NO. 3:22-cv-2118-X

----------------------------------------x

SECURITIES & EXCHANGE COMMISSION,

Plaintiffs,

v.

THOMAS LYNCH BARTON, et al.,

Defendants.

----------------------------------------x

TRANSCRIPT OF THE HEARING

BEFORE THE HONORABLE BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

Dallas, Texas

December 19, 2022

10:03 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFF:

SECURITIES & EXCHANGE COMMISSION
801 Cherry Street
Suite 1900
Fort Worth, Texas 76102
BY: KEEFE M. BERNSTEIN, ESQ.
bernsteink@sec.gov
(817) 900-2607

FOR THE DEFENDANT BARTON:
HUNTON ANDREWS KURTH, LLP
2200 Pennsylvania Avenue NW
Suite 905
Washington, DC 20037
BY: MICHAEL J. EDNEY, ESQ.
TED HUFFMAN, ESQ.
medney@HuntonAK.com
(202) 778-2204

FOR THE RECEIVER:
BROWN FOX, LLP
8111 Preston Road
Suite 300
Dallas, Texas 75225
BY: CHARLENE KOONCE, ESQ.
charlene@brownfoxlaw.com
(214) 327-5000



COURT REPORTER: MS. KELLI ANN WILLIS, RPR, CRR, CSR
United States Court Reporter
1100 Commerce Street
Room 1528
Dallas, Texas 75242
livenotecrr@gmail.com

Proceedings reported by mechanical stenography and transcript produced by computer.

* * * *



- P R O C E E D I N G S -
-o-

THE COURT SECURITY OFFICER: All rise.
THE COURT: Thank you.
You can be seated.
Okay. We are on the record in Case No. 3:22-cv-2118. That is SEC versus Barton, et al.
Let's do appearances first, for the SEC.
MR. BERNSTEIN: Your Honor, Keefe Bernstein here on behalf of the SEC.
THE COURT: Thank you. Thanks for speaking up since we don't have a microphone for you.
Okay. Who is here for Barton?
MR. EDNEY: Good morning, your Honor.
Michael Edney and Ted Huffman from the Hunton Andrews Kurth law firm for Mr. Barton.
THE COURT: All right. Thank you, Mr. Edney.
And who is here -- so I understand, do we anyone here for Wall?
No one here today for Wall.
Okay. How about for the Receiver?
MS. KOONCE: Good morning, your Honor.
Charlene Koonce on behalf of Cort Thomas, the Receiver.



THE COURT: Okay. Thank you, Ms. Koonce.
All righty. So we are here on the pending motion for the sale of property. So what I need to do is talk through with Receiver's counsel if we've got any other competing offers. I see that you filed your notice yesterday of no further competing offers.
But tell me the update on that. Any new ones in, and then talk me through best interests, and why you think it is in the best interest of the estate.
MS. KOONCE: Thank you, Judge.
Would you prefer that I approach at the lecturn or stand here?
THE COURT: So you can go either place.
I will say for everybody who's speaking, if you are going to sit at counsel table, just stay seated because once you stand up, you are far away from the microphone.
So wherever you want to go is fine by me, sitting at counsel table or standing at the podium.
MS. KOONCE: I'm actually just more comfortable standing, if it's okay. So I'll --
THE COURT: Fine by me. Go for it.

MS. KOONCE: As you are aware, by your reference to the Receiver's notice, that we did publish notice of the sale and notice of the hearing, which is required by the statute that governs this sale. We did not receive any competing offers.

As we stated in the motion to approve the sale, the motion to appoint the appraisers, there were negotiations on the contract that is before the Court. This was the highest offer received out of four offers.

As the Court is aware, this sale does comply and exceed what the statute requires. It is more than the two-thirds minimum. In fact, it is higher than the appraised value that was submitted.

As the Court requested, I would like to provide some information about why this is in the best interest of the estate.

As the Court is aware, from numerous filings, we have very limited cash and at the same time, we have competing requirements for the cash on hand. For instance, we need to pay insurance on this property and multiple other properties.

We have one property that is subject to HUD loans and those HUD loans require continuing



certifications from accountants. Those are very expensive. And if we don't pay those certifications, the HUD loan could go into default and it could then forfeit the interest, the receivership estate's interest in that property.

Those are just some of the competing obligations that we have for very limited cash.

I know there is a motion to stay the sale. There is a motion that is -- there's an objection to this sale that contends that this sale should not go forward now, that there could be the possibility of irreparable harm. And Judge, the sale has to go forward immediately.

This sale, this property, like every other receivership property that we have encountered so far is heavily encumbered. And it is not encumbered by a traditional loan. It's encumbered by a loan that's incurring interest at 9.9 percent. It's interest only. The lender claims that there is default interest accruing at 18 percent.

We also have to continue to pay taxes. We have to pay the utilities, so that the pipes don't freeze during this weather.

If we don't sell the property very quickly, that interest that is accruing and not



being paid, because we don't have access to pay it, will erode all equity in the property.

THE COURT: When are property taxes due? January 31st?

MS. KOONCE: I'm not confident that is correct but I think so.

THE COURT: Okay. Generally speaking, all property taxes are due January 31st.

MS. KOONCE: I believe that's correct.

THE COURT: Some people pay them the year of --

MS. KOONCE: Yes.

THE COURT: -- December 31st, so that they get the tax deduction for them but --

MS. KOONCE: That is correct. And there's a -- there's a higher assessment -- yes, if you pay late, it increases. That's absolutely true.

THE COURT: Understood.

Okay. So I understand from Barton's filings that Barton would like to rent the house.

Talk me through that scenario and why -- I know you have already talked me through, you need the cash in order to maintain the other properties. Talk me through why it's not --

MS. KOONCE: Right. That would have been



an excellent offer, possibly.

First of all, it was never made. It was suggested in a filing as an alternative as opposed to any communication in response to any conference. It was never offered.

Additionally, the monthly interest on this loan is about $11,000.

We did a little bit of research. The highest monthly rental for any property in the location is about $9,000.

So if Mr. Barton would like to offer and put in place today -- we've had a lot of delay in our communications -- but a contract in which he rents the property, pays all of the accruing mortgage expenses, the insurance, the property taxes, and he's going to warrant that he's not going to remove any more of the property from the premises.

We took possession of it on a day after we had received notice that he was moving art, not just personal belongings, but art and valuable items out of the house.

If that was something that could be put in place immediately, we would consider it. The offer was never made. It was an argument raised in a

motion. There was no conference, there was no request that that happen. So our contention, Judge, is that the time to consider that offer has long since passed.

In addition, as you have observed, paying the expenses to maintain the equity in this property would not help the receivership with our cash issues.

Now, I know the Court is aware, we've also filed a motion to ratify approval of a settlement with another entity. And that potentially could bring in sufficient assets to maintain some of these other properties for some limited period of time.

We didn't receive a conference as to what -- there was no response to our conference as to whether that is going to be opposed. We don't know if the Court is going to approve it. We don't know when that will happen, if it will happen at all.

But the receivership cannot maintain the other properties that we have an obligation to manage without cash. It is just not possible.

With respect to the contents -- I don't know if you want to take that up now.

THE COURT: Sure. I would like to hear



from you.

MS. KOONCE: So there is a motion, as you know, to sell the contents of the property as well. Mr. Barton has also objected to that proposal.

As you are aware from multiple filings and email communications between counsel, we offered to store and hold that -- those contents, at Mr. Barton's cost because, again, the receivership does not have the funds to pay to move those contents out and store them. And we got no response.

In addition, we have asked for confirmation that the furnishings in this property were actually purchased by Mr. Barton. We have received no response to that either.

The response has been, Mr. Barton lived in this property, it was owned by a single purpose entity, therefore, it is his.

Well, the receivership order says that all of the assets of all of these entities now are in the Court's possession and, therefore, the Receiver's possession.

We know, from looking at the bank records, that there was extensive commingling. The Receiver, also, in his investigation, learned that most of the contents of this property were purchased within the



last two years by receivership entities.

We have had absolutely no response to that, that, hey, we need some time to look at credit card statements, we need some time to gather information to demonstrate that these assets were actually purchased by Mr. Barton, none of that.

Instead, Judge, what we have is a continuing disregard for the Court's authority and the receivership order.

For instance, in filing a lis pendens that we discovered was filed the day we conferred on the motion to sell the property. It was filed on December 1st.

Now, the response to that was filed very early this morning was that the Court does not have the authority to declare that lis pendens void. I think that is absolutely incorrect, your Honor.

We relied on Property Code Section 12.008, not 12.007. It is a different procedure. I think the bankruptcy cases that we cited absolutely provide the Court authority.

The Duval case was an instance in which the debtor filed a lis pendens on property that he did not want to be transferred subject to a planned confirmation. The bankruptcy judge said, you cannot



accomplish a stay through a lis pendens which has already been denied in the litigation.

But if the Court is uncomfortable with that procedure, you have a much more simple and direct route as well.

Because the Defendant here has violated your receivership order, you can compel him to sign a release of lien, which we brought with us today. That's absolutely permissible, Judge, that you require the obedience and observance of your court order to allow the sale to proceed in the manner that is contemplated by the receivership order.

In short, the sale is in the best -- in the best interest of the receivership estate. It is absolutely essential to maintaining the value of the other properties that are in the Receiver's possession and control.

We have had no other competing offers. We have satisfied the statute. Everything that is necessary for the Court to consider the sale, I think, has been presented today. But we are, of course, happy to provide any additional information that you need.

THE COURT: Thank you, Ms. Koonce.

MS. KOONCE: Thank you.

THE COURT: All righty.

And let's hear from counsel for Barton, Mr. Edney.

MR. EDNEY: Thank you, your Honor.

Before the Court today is a request to authorize the sale of Mr. Barton's only home.

Since the Receiver kicked Mr. Barton out of his home on October 20th, he's been sleeping on his daughter's couch.

At this stage of the case, the Government has alleged violations of the securities laws but the Government has not produced the documents underlying those claims to us; the Government has not attempted to prove those allegations before a trier of fact.

At the same time, we are challenging the existence of this Receiver and certainly his authority to undertake liquidation.

This sale, your Honor, is permanent. It is a permanent action that would cause irreparable harm and be almost impossible to reverse.

The Court should deny this request to undertake the Receiver's action at this time.

Your Honor, respectfully, selling the -- selling Mr. Barton's home is beyond any legitimate



purpose for this Receiver at this point of the proceedings, prior to any proof, much less finding of liability on the underlying charges.

THE COURT: So receivers can't sell any property until there's a liability finding, in your view?

MR. EDNEY: No, no. I think a receiver could sell property under certain circumstances before there is a liability finding, but that is the extraordinary circumstance.

Then in the general course of events, a receiver is supposed to conserve and identify assets for use, if there is an ultimate finding of liability, or for return to the Defendant in the event that there is not a finding of liability. It is to conserve the status quo. And this sale would alter the statute quo in a way that is almost impossible to reverse, not conserve it.

There are cases that find an extraordinary need to sell certain forms of property to raise cash to keep operations going. But that showing hasn't been made here, your Honor.

And your Honor, I think it is important to note that the Receiver's first order of business, the day 2 action here was to kick Mr. Barton out of



his home.

It was listed for sale roughly two weeks earlier, and not after some kind of sober appraisal of the financial condition of these entities. And it's not a matter of last resort; it is a matter of first resort.

In our view, respectfully, the Receiver's focus needs to be on the management of the high value commercial real estate assets that are under the control of the business entities, the business entities.

And for cash needs, for some of those assets, Mr. Barton has facilitated offers for those assets from third parties and will consent to their sale pursuant to a well thought out process. And there is many examples of that in the record before the Court at this point.

And let me just mention just a few.

Right now, there is a -- there is a pending, before the receivership order sale, 54 lots at the Venus complex for $3 million that is designed to net $600,000 in net equity.

At the Frisco complex, there is a proposed sale of $9 million in property that would net $3 million in net equity.



With regard to the big apartment portfolio, these are the HUD-backed properties in Fort Worth and elsewhere, at three locations, offers have been raised for $110 million to sell those.

There is a dispute with the Receiver about how much in net equity that would raise, but -- but, in no case is that number less than 7 figures. In fact, in the high 7 figures, into the 8 figures.

So focusing on the business operations of the legacy Barton entities themselves, the focusing on the commercial aspects, there are ways to raise cash that we would consent to, frankly, that are less drastic than selling something so personal to him as his house.

THE COURT: Have you consented to them?

MR. EDNEY: Your Honor, we have -- we have teed them up for the Receiver. We have said that we would consent to them, if they went down the process of getting serious about it and lining it up.

And on that, we have received no meaningful response. We have seen in some of the filings -- these have been in the course of arguments -- that, well, there is a complication here, there is a complication there. But it has not received serious treatment.

And I think that those commercial avenues need to be explored before we go down such a low value proposition of selling this house and something that is so personal to Mr. Barton. And -- and --

THE COURT: Are those properties under 11 percent interest-only loans?

I mean, I get your point. But I'm trying to figure out, it seems to me that this home is in dire straits of because of how it was financed.

MR. EDNEY: But --

THE COURT: And I don't know if the commercial properties were under the same dire straits.

Can you talk me through that? I mean, you are telling me that they would be more profitable to sell.

But if there needs to be a quick sale, it is probably because of the dire nature of the financing of this. So what's the dire nature of the financing of those commercial properties?

MR. EDNEY: Well, I'm not sure that there is a dire nature of financing for those properties, but they would raise cash for the -- for the Receiver's operations.



When the Receiver came and proposed the sale, the purpose of the sale was to raise cash for the Receiver to keep going and doing its work, presumably to pay its fees, presumably to pay other ongoing expenses.

These commercial avenues provide a mechanism for doing that. I mean, frankly, we don't think the house should be in the receivership at all. You know, we have urged that upon this Court. We think under the -- under the Fifth Circuit's Janvey case, there needs to be some effort to trace assets related to these lender loans that are the subject to the SEC's complaints into the purchase of that house. That hasn't been done.

The only reason it is here is because it has been -- because it was held by a special purpose corporation. It had no other business than holding this house. Other net worth -- high net individuals do this.

And I would direct the Court to the SEC's opposition to our motion to stay this receivership or aspects of it.

And this can be found at Docket No. 83 in this case.

Judge, the whole first two pages of that



submission from the Securities & Exchange Commission focuses on the decision that the SEC made not to put Mr. Barton personally in the receivership. And that was an option the SEC believed that it could have, generally speaking, in cases of this nature to choose to put the Defendant himself, in his individual capacity in the receivership.

The SEC chose not to do that. Instead, it focused, you know, just on his business and commercial interests.

And your Honor, I would submit to you that this particular piece of property -- I mean, it is unique in this regard, the house and the property inside of it, his personal belongings, is not just business. It doesn't have to do with his real estate operation. It just happened to be held by a special purpose corporation that did nothing else than hold this property.

And unlike for the 26 companies that the SEC originally thought -- sought to put in the receivership, there was an effort, through the Carol Hahn declaration, which we have some issues with, but there was an effort in that declaration to trace the -- the funds from the -- from the lenders that are subject to the SEC action into those



corporations, right?

Under Janvey versus Adams, the 2009 Fifth Circuit case. And they said, look, some of the -- some of the funds that were received from the lenders from China, they went into those corporations and they were plowed into real estate projects, into this real estate -- commercial real estate development business.

But there was no effort to do so here with regard to this particular entity whose only purpose was to hold Mr. Barton's residence.

And frankly, your Honor, if this corporation were not inside the receivership, and we don't think it should be, the mortgage, no matter its terms, and I -- you know, listen, I get the fact that the interest rate is probably not the one that you are getting or I'm getting. You know, it's higher than that.

But that interest rate and the carry and the maintenance of this house would be Mr. Barton's problem. You know, he would either have to live up to it or the house would be foreclosed upon.

It wouldn't be the Receiver's problem, and I think this is an example why this shouldn't be in the receivership to begin with.

And that is for two reasons, your Honor. First, we haven't seen that tracing of assets into this.

Second, it was a uniquely personal exercise. I'm not going to come up to your Honor with regard to other corporate entities, other of the 155 entities that have now been placed in the receivership and say that that it is uniquely personal. It doesn't have to do with the commercial real estate development business that Mr. Barton was undertaking.

But this particular property, your Honor, this is -- this is very, very personal indeed. And it doesn't need to be in the receivership. It should be taken out of it. And should be made Mr. Barton's problem, not the Receiver's problem.

If that's the justification for selling this house, and it's a shifting justification, your Honor. That it is just too hard to deal with this place. It's not -- it is not worth the candle power. Then give it back to Mr. Barton and have him deal with the problem, right?

But instead, where this started was, we are going to pick out this one, this one to keep the lights on, to get our cash flow issues straight for



all the other business entities.

Your Honor, first of all, I don't think that is necessary given the other commercial properties that can be used for that purpose.

But second, your Honor, you know, it is -- it is an extremely personal invasion into Mr. Barton's property rights before he's been adjudicated to have been responsible for any wrongdoing of any kind.

Your Honor, in that regard -- in that regard, turning back to the -- to the -- to the alternatives to this, focusing where the SEC has claimed all wrong, the focus of this receivership should be on the commercial real estate development business.

There are those three other options that I talked about, you know, with regard to servicing the HUD loans, the cost of servicing those loans has been prefunded by independent lending and is on autopilot.

Now, you have not seen the sustained showing from the Receiver that this type of drastic action, taking a man's home before any adjudication of liability is necessary to prevent the loss of crucial assets that are needed to reimburse



potentially the alleged victims of these events. And we will contest that liability. We do not think that he is responsible for it.

But just assuming for sake of argument that he may be in the future, that showing of necessity has not been made.

On top of that, your Honor, we do have a pending appeal on this. And what the Receiver is asking for is liquidation authority that is not currently entailed by the Court's order under appeal.

It is an expansion of the Court's order. And under Fifth Circuit precedents, we don't think the Court has jurisdiction to take this extra step to expand the authority of the Receiver to sell this house.

Your Honor, on the personal property, I want to correct the record a little bit on this personal property issue.

We have had to drag out of the Receiver what he plans to do with this personal property. We want that personal property back. We have been willing to come by, on an hour's notice, with movers to take it out of the house. This is -- this is not receivership entity property. It is property that



happened to be in a man's house. And -- and you know, with regard to this exercise, without access to our business records, without access to the materials in his home, without access to the materials at his office, to go back and prove the financial provenance of every couch and chair, every dish and glass, every piece of clothing in that house is unreasonable.

Where else does one keep one's personal property than in the house in which he lives?

I mean, this is man is 60 years old. He's accumulated some stuff. Apparently, not a lot of it. It is proposed to be sold for $20,000. So -- so not too much.

But he's accumulated some stuff over his life and it is very harmful for that to just be taken away.

And the apparent basis for that, your Honor, is the Receiver's assertion that, well, listen, this -- this house that was owned by a corporation, we haven't traced any lender assets in it, but it was owned by a corporation, so the things in it belong to us.

I don't think there is any basis for that proposition in the Court's order. I don't think

there is any basis for that proposition in law. And whatever your Honor does with the house, I believe the Court should order the Receiver to make that personal property available to us for pickup and return to Mr. Barton's possession.

This $20,000 issue is not worth it, and is more in the manner of a personal attack than in the administration of receivership property.

THE COURT: All right.

Talk to me about their proposed alternative to where they would store it but at Barton's expense on the continued storage cost until a later adjudication can be made on tracing.

MR. EDNEY: Well, your Honor, I am personally not familiar with that proposal. But if it -- but if that is -- you know, I think the right thing to do at this point is to return the property to Barton. But absolutely, it should not be sold.

So if that is -- if that is the halfway house, that it is moved out and moved into a storage locker, where it can be kept safe, pending the resolution of the appeal, that that absolutely should be the alternative that the Court takes instead of approving the sale of this property for



$20,000 to a stranger.

THE COURT: Understood.

MR. EDNEY: Okay. Your Honor, the -- you know, the SEC-sought receivers are not unprecedented but this one, in our view, is extraordinary and contrary to precedent.

SEC-appointed receivers are for Ponzi schemes and emergencies of eminent asset flight. They are for the Stanfords and the Madoffs of the world.

And Mr. Barton is not alleged to have been running a Ponzi scheme. Is not, your Honor. I mean, there is -- there is a flake of that allegation in the SEC's papers, but it is not sustained, and there -- there is barely a sentence behind it.

And he's not dealing in portable assets, at risk of imminent flight to Switzerland, or some other far stretch of the earth.

He has run a prominent real estate development business in Dallas/Fort Worth for the last 30 years. And because of that, the assets of that business and their associated entities, they are stationary, they are stationary commercial real estate projects that aren't going anywhere and that



can have an eye kept on them.

Moreover, the value of those assets, according to the SEC's initial filing, exceeds $70 million, well more than the $26 million that the SEC is allegedly at issue with regard to these lenders.

The value of those assets, your Honor, however, depend entirely on managing them competently to their development maturity. And the way to destroy that value is to hand them over to a receiver that does not intend to manage them, does not intend to keep going as David Wallace would have, the SEC's requested Receiver, but instead -- but instead to liquidate them now in premature sales.

Now, this is incredibly harmful to Mr. Barton, but it's also particularly harmful to the unsecured lenders, the Chinese lenders, who are the subject of the SEC's claims.

In this case, the situation explains why the Fifth Circuit, in its 2012 Netsphere versus Baron decision, set down rules for when a prejudgment receiver could be ordered. Allegations of fraud are not enough. That is what the Fifth Circuit said.



Instead, the SEC must show that the receivership is necessary to prevent the flight of assets subject to the SEC's claims.

And again, there has been no evidence of a flight risk. And it is inconsistent with the nature of the assets that the SEC has long said they are subject here.

I mean, these are assets planted in the ground, recorded on public records and very difficult to sell without making, you know, a lot of -- a lot of ruckus with everyone else.

THE COURT: You can sell a company more quickly, though, right?

I mean, it was titled in the name of a sole purpose company. I'm sure it takes time to sell real property, but you sell a company that holds real property and that can be done in 24 hours or less.

MR. EDNEY: You can certainly try to do that, right. You can try to sell the company.

THE COURT: I have seen it done.

MR. EDNEY: Oh, I understand. I understand, your Honor.

But -- you know, again, when we -- look, what the Netsphere case says, right? Is it needs to

be necessary to prevent asset flight. So you can't just say, I think it is going to happen. There needs to be proof that is happening.

We didn't see that in the SEC's submission. And this is not a case that the SEC just dipped its toe into yesterday. They have been investigating Mr. Barton for two years.

And we will have many things to say about the SEC's substantive allegations when the time comes.

But there is no evidence in the record that this was some kind of emergency where -- where the assets were about to fly away. There is no showing of that in the record.

On top of that, your Honor, what Netsphere says -- and I think this is important, not just for the existence of the receivership, but how the receivership is administered, is there a less drastic, a less burdensome on the Defendant alternative to achieve the goals of conserving assets and making sure that they are around in the event of an eventual finding of liability.

And this is -- this is -- this is absolutely applicable to the SEC cases. And you need to look no further than -- than a decision



authored by the judge, who is peering over us today, Judge Fitzwater, the SEC versus Faulkner decision in 2018, where he applied these standards and made sure that they were satisfied.

With regard to that less burdensome alternative is the proposal that we put before your Honor in opposing the imposition of this receivership. And that is, a monitorship, under the SEC's selection of David Wallace, a man very experienced in running a real estate business, that would have achieved this end, it would have prohibited any sales of the corporations or the real estate that you are talking about, but it would have permitted the management of those projects so they could continue to create value.

And Mr. Barton certainly has an incentive to make sure that they're as valuable as possible, not only to pay back the unsecured lenders that are the subject of the SEC's case, but to make sure that they create as much value as possible to be left over for other investors in the project.

That -- that alternative navigates through the -- through the problems that are presented here. We don't have -- we don't have evidence of imminent asset flight.



We do have evidence that if we -- if we bring in somebody to run this business that cannot move these projects to development maturity value is going to be destroyed.

The solution is to put orders in place that prevents their sale, put a monitor in place that is sophisticated in terms of making sure that the projects move forward, that transactions that need to be done to move those projects forward are done, but those that present any risk of asset flight or loss to the assets are not done, and to continue to report to this Court and to the SEC about it.

That -- that alternative was presented in our papers, but I think recent events show how important that alternative is, how important it is for the lenders that are the subject of the SEC's complaint, how important it is under the Baron -- Netsphere versus Baron standards.

Because these projects can't just be sold right now. They are going to be left with a massive loss if they are; they're not ready yet.

That's what real estate projects are. They have a cycle. And for many of these that you are going to hear about over the next couple weeks



where they -- where the Receiver comes to you for permission to sell these properties, they are not ready to be sold. If they are sold now, they are going to be sold for pennies on the dollar.

But instead, we need a system where these things are managed to their maturity. And that's -- and that's very possible here. And look, I understand the real estate development business is complicated. I wouldn't be very good at it. But we need somebody in place who is good at it. And we need -- and we need a system where they can be managed and we are not just fire-selling for pennies on the dollar because that is not good for any of the entities that are involved here.

Also, your Honor, we have to be mindful of the situation we find ourselves in.

This is a situation where the Government chose to launch a parallel criminal prosecution on the same day as this SEC case. And this SEC case was always meant to achieve this receivership and be stayed and turn the criminal case into the main event.

In light of that, this is also not an emergency. The SEC has been investigating this for two years.

In light of that, we need to be mindful of whether the receivership and the steps the Receiver is taking are truly necessary or whether they involve an effort to increase the pressure on a criminal defendant by taking his property without any proof of wrongdoing -- before any proof of wrongdoing is made and by hampering his ability to defend himself, to forfeit is right, to put the United States to its burden of proof in the criminal case.

And with so many questions surrounding the propriety of this receivership, we believe that your Honor should not approve the irreversible permanent sale of Mr. Barton's only home.

And if your Honor is inclined to grant the Receiver's motion, we ask that your Honor stay it with immediate affect pending appeal to the Fifth Circuit.

Thank you, your Honor.

THE COURT: Thank you. I appreciate that, Mr. Edney.

Okay. Let me ask, then, SEC, does the SEC have anything to say at this point? I should probably give final word to Receiver's counsel.

You can say anything you want to; I just didn't know if you want to talk today.



MR. BERNSTEIN: Your Honor, I don't think we have anything to add on the issue of the sale of the home. I think it's in our view --

THE COURT: I'm sorry. Do you mind hitting that mic just for us to hear what you do want to say.

MR. BERNSTEIN: The Receiver has put forth a compelling case for why the home needs to be sold. The Receiver has put forth competent evidence that they will be achieving fair value, and nothing that we saw in the papers or that was argued today led us to believe that there would be any reason to second guess the Receiver's judgment in this situation.

And that is our position on the sale of the home.

We obviously reserve our rights to make arguments and have been making arguments in the papers about all the different issues that Mr. Barton's counsel attempted to raise here at argument today about the receivership itself and the scope of the receivership. But I'm also happy to answer any questions the Court may have on those issues as well.

THE COURT: I really only have one question for you today.



And that is, I know there were allegations made that because there is a prosecution going on, this may -- them acting on the home first may seem to be leverage on the prosecution.

I'm going to try to tell you a disclaimer and then ask you a question.

The disclaimer is, in cases like this, I usually don't pick the SEC's recommended receiver. And it's not because I think you are bad people. I think you are lovely people and your proposer picks would be lovely.

But I like separation when it comes to the receiver in cases where there is also a criminal prosecution, so that we can't have the type of collusion that he's suggesting might be occurring in this case.

So my question is this: Has the SEC been suggesting to the Receiver that they go after the home first to apply more pressure on Barton as a result of the criminal proceeding?

MR. BERNSTEIN: Absolutely not, your Honor.

THE COURT: Okay.

Have they suggested that to you -- that if they go after the home first, that might help your case on the criminal side?



MR. BERNSTEIN: They have not.

THE COURT: Okay. Got it. That is my only question for you.

MR. BERNSTEIN: Thank you, your Honor.

THE COURT: You bet.

Okay. Final word. And I would like to hear your thoughts. I know their suggestion of David Wallace as the Court-appointed monitor will conserve resources for the receivership estate.

I know, in my mind, that is an argument more largely directed to future discussions rather than today's discussions.

We are not talking about a real estate project that is 80 percent developed with regard to this home.

But that is a key question in my mind.

And then the other question I would have is, talk to me about offers on other properties, like the Frisco property, how quickly you think they could bring cash in to the receivership that would keep the lights on at the other properties.

MS. KOONCE: So you do want me to address the monitorship? I want to be clear.

THE COURT: I would like to hear but not in full depth because I think it is largely a question for another day, if that makes sense.

MS. KOONCE: Yes.

THE COURT: But when the other day comes, you will be a hundred percent down the track you want to. And I know y'all are thinking of which track to take at this point.

So my question is largely one of this 30,000-foot discussion on the monitorship.

MS. KOONCE: Let me step back from that just for a second because I would like to address the contention that receiverships are only for Ponzi schemes and the suggestion here is that a receivership or a monitorship would simply hold assets until the end of the day following a judgment.

Your Honor, that's a post-judgment remedy, right? If you're not going to sell anything, we can't do anything, that is a post-judgment remedy.

If you want a receivership or a monitorship, you have to have assets to manage what you have. Whether or not those assets are necessary to continue paying for appraisals on a property or development to see it to fruition, you have to have



assets. And if that occurs in the context of a monitorship, the Receiver is still going to have -- needs cash. It is going to have to raise money somehow.

There is no cash here. So whether you had a monitorship or a receivership is irrelevant to that particular issue.

I have been involved in many monitorships. I've been a monitor for the FTC in cases. It is far more expensive than a receivership, to be perfectly honest. And if the goal here is to preserve assets for the victims of the fraud that is alleged by the SEC, then the goal here is to be expedient with the money that we have.

A monitorship requires extra layers of supervision and it is very difficult to supervise, for the Court to supervise, for the monitor to supervise.

It is very difficult for banks and third parties to comply with, because you have to look at every single thing that comes through as opposed to appointing one person who is the receiver, who is the Court's agent, who is complying with the Court's order. It is much more expedient.

So my suggestion with respect to a



monitorship is that you would be undermining the goal of the remedy that is here. Even if you wanted to have a monitorship, however, as I said, you have to have assets. You have to have cash in order to protect the value of what is at stake.

My understanding with many of these developments is that, for instance, the properties that should be sold quickly, but at the same time they are going to take years to develop -- that is what we just heard, right? The Receiver should be accomplishing these sales very quickly but we're not going to see the value until many, many years down the road. That is a contradiction, your Honor.

If we have to develop these properties by putting in roads or obtaining entitlements from the government, somebody has to supervise that process and we have to pay vendors and other people to accomplish that.

That has to happen in a monitorship or a receivership, either way. So the problem here is, the way these businesses were structured, at least from our perspective is, they are all highly leveraged. There is almost no cash.

Mr. Barton, himself, was struggling to pay for the development of these. We know that is true,



because when we stepped in, we stayed four foreclosures, four of them.

So if the issue here is preserving assets and you want to have a monitorship, are you going to still stay foreclosures so that we can preserve these other assets?

We have -- the problem here, your Honor, is a failure to be in touch with reality. These properties -- the property at issue here was on the market. There was a listing agreement signed that we found in the office when we came in.

So while it may be Mr. Barton's personal residence, and we are not unsympathetic to that issue, he was preparing to sell it when the receivership -- when the receiver order was entered.

I don't know what was behind that. I also am frankly shocked that Mr. Barton would come to the Court and make arguments that the SEC or the Receiver, for instance, has not been able to trace assets into this property.

While at the same time, he has failed and in fact refused to comply with the Court's order to provide bank records and accountings and information and indeed an inventory of the assets that he removed from that property. Items that could have

been sold that would have been less dear and personal to Mr. Barton.

Additionally, we know, just from the information that we saw in the Turtle Creek office, that Mr. Barton has treated these entities as his personal wallet, if you will.

We have assets that were listed on an accounting statement for JMJ Holdings, which reflected $12 million in art. $12 million in 2019. And yet Mr. Barton has given us an inventory of art worth, I think, $80,000 and said it was all his, purchased with his own money.

Where did that $12 million in art go, your Honor? We don't know. Because Defendant Barton will not comply with the Court's order.

For him to come to the Court today and complain that the Receiver or the SEC, for that matter, has been unable to trace assets into -- trace the investor funds into these assets is very disingenuous.

With respect to the personal belongings -- I don't know if you want to get into any of that. I can address those issues, but I know you wanted me to speak to the monitorship.

THE COURT: Yes. I think you already



have.

MS. KOONCE: Okay.

And what was the other issue that you wanted me to address specifically?

THE COURT: If sale of other properties, like the Frisco property, could be accomplished in time to generate cash for the receivership.

MS. KOONCE: Yes.

And thank you. I'm sorry I had to ask you to repeat the question.

Absolutely not. These are, as Mr. Barton has alluded, these are complex properties. Every single one of them is subject to extensive liens or competing claims in equity. Some of them, those competing claims, potentially extinguish any value held by the receivership estate.

But even if you assume that is not the case, if you just look at one property that is not subject to a competing claim of ownership, as opposed to a lien, it will take months. And we do have, I think, letters of intent on several of them. We have one that is potentially subject to a contract; Mr. Thomas could speak to that more clearly.

But even those contracts contemplate



months and months and months to get to a potential sale.

And as Mr. Barton also has stated, while he might agree to the sale of those properties, he's alluded that the Receiver has not given full attention or full effort to the sales that he would prefer that we -- that we focus on, and that is because what we have said in emails that are part of the Court's record, I think they were submitted with the Receiver's response to the motion to stay, the properties at issue there are subject to huge liens.

So while we would prefer to sell those properties as well, we would have been happy to proceed immediately to that.

It still would not have satisfied our immediate need for cash to preserve the other assets and, frankly, to sell those additional properties.

We can't sell them without paying for appraisals. We can't sell them without accommodating the requirements of the statute.

So our hands are tied. And Mr. Barton has tied them in the way that he has managed these properties, drained all the cash out of the bank accounts, at least the bank accounts we have been able to find to date. There may be more, we don't



know. He won't tell us.

With respect to Mr. Barton and his counsel's familiarity with our request or offer to store the contents of these properties, with all due respect, Mr. Edney is aware of that offer. It was sent to him in an email, very, very specific. We would be happy to do this. And that email is in the Court's record, in the appendix, in support of the Receiver's response to the motion to stay.

I highlighted that. It is in the docket. We sent, I think it was two weeks ago that we would be happy to do that. We got no response.

So respectfully, your Honor, we are stuck. The Court has appointed Mr. Thomas to oversee these properties, to manage them, and to preserve their value. We cannot preserve the value in the more larger properties, the properties that will take months to years to either bring to fruition or to sell.

We are not receiving cooperation from the Defendant. We are not receiving the materials that the Court ordered him to provide.

And yet, we are being told to sit and wait while these properties potentially dissipate in value and we are not able to accomplish the mandate

of the order.

THE COURT: Thank you.

Can I ask you one final, quick question?

Can you flush out your tracing argument a little more? Because I know he made a lot of that, in not following Janvey and having an exact tracing of the funds used to pay for this home, tracing back to the original alleged unlawful conduct.

MS. KOONCE: Yes, your Honor. So let me start also with the Janvey versus Adams. There's a million Janvey cases.

Janvey versus Adams, first of all, was not a tracing case. It was a -- an issue as to whether or not certain investors were properly named as relief defendants. And a relief defendant is completely different context than what is going on here.

But with respect to tracing, I think this is Mr. Barton's argument that the Court reconsider entry of the receivership order from its inception.

The Receiver, as you know, we didn't have anything to do with the SEC filing its case, didn't have anything to do with the Court's decision as to whether to appoint a receiver but the -- in seeking a receiver and filing that motion to appoint a



receiver, the SEC engaged in some tracing and what the evidence in support of that said was, to the best of their ability at that time to trace, they had discovered commingling, I think the Hahn declaration said from the very beginning of the investments.

And what the Receiver has discovered, obviously, we were able to go in and obtain additional information that the SEC did not have at the time it filed that motion, we have discovered additional commingling.

We filed, as you know, a massive appendix in support of the Receiver's motion to demonstrate that the additional entities that were operated by Mr. Barton were properly within the scope of the receivership order as entities controlled by him.

But in addition to that, we have seen extensive commingling, that one entity takes out a loan to purchase property for another entity and that same entity pays off another loan.

We have also seen evidence that we believe suggests -- and I'm not going to testify that it does or provide testimony -- but it suggests that there were some efforts here to put intercompany loans in place after this happened in order to



justify the banking transactions that we've seen.

Now, we have sent the receivership order out to dozens of banks, and we have received some banking records back.

We do not have access yet to all the QuickBooks accounts. Our understanding is there are 26, I think -- QuickBooks accounts. We tried to get access to that. It was denied. We were not given those credentials.

We still do not have credentials to the websites. We don't have credentials to the cloud data that would allow us to find information about what was happening with these assets. It's not been provided. Even though the receivership order compels it, we specifically asked for it over and over again.

And we have conferred about a motion to show cause and -- because of the violations of the receivership order.

If we had that information, it might have allowed us to provide more detail in terms of the potential commingling of investor assets that we have seen.

But what we have seen to date says, we haven't seen any evidence that any money was not



commingled; it was all commingled. We haven't seen any segregation of assets between specific entities. It just -- there is no evidence that that actually happened.

So it is not possible for us at this -- I think we are 60 days in, to tell the Court, absolutely, we saw money coming, you know, from one investor into this entity to purchase the house. We have seen no other explanation, however, for how these businesses were operated.

So we -- while I believe down the road is it possible that we may be able to provide that information? Very likely. I think it is probably going to be the SEC's burden.

But at this point, it is not possible for Mr. Thomas to perform the Court's mandate to protect these additional assets without cash. We just can't do it.

THE COURT: Understood. Thank you.

Okay. So what I need to do is make some findings and rulings now that I have heard the parties out.

What I'm going to do is talk first about the sale of the home, second about personal property, and then third about the stay.

On the sale of the home, here are my findings:

First, just mechanically from a numbers standpoint, I think the sale price being above the appraised value, obviously meets the two-thirds test in the law. So I think it meets the legal test for sufficiency, and I find that there are no competing offers that meet the threshold of being 10 percent higher than that offer.

Is it in the best interest of the receivership? I think it is, notwithstanding the personal connection of the home.

On the personal connection of the home, I do note the listing agreement that they found when -- when they took possession of the property.

I have had another situation like this where someone argued it was intrinsically personal to them. I went with them on that and then they put the home up for rent.

So I have been burned by that before and the listing agreement tells me that perhaps the personal nature of the home isn't as strong as it otherwise would be.

But here is my analysis on the rest of it.

First, it is an interest-only loan, right?



9 percent is the floor and then foreclosure rates go up from there.

Interest rates are still increasing. And then we had the Federal Reserve in Dallas say that residential properties could diminish in value by 20 percent, given the economic forecast that they are seeing. Could; doesn't mean it will. And so that is the backdrop I'm looking at this in. And I will take judicial notice of that because it is the kind of the thing I can take judicial notice of.

Property taxes are due January 31st. There is cash needed to keep the receivership going to maintain the other properties that are in the receivership estate.

The sale of other properties are not as efficient from a timeline standpoint as the sale of this property because they are not properties in development or have other encumbrances on them, like the other commercial properties would.

On commingling and tracing, it seems like commingling was the rule of the day for how Barton ran his different entities. And so I think I have seen enough to know that it was funds that were at issue in the SEC allegations that were used for the home.



And then seventh is, while this property isn't necessarily mobile and subject to offshore dissipation, I do think the asset value of the property is dissipating, right? When we look at the potential 20 percent drop in the value of all homes in the coming year, when we look at the interest-only nature of the loan, the property taxes that are due, this property is unlike the other properties, in that it is a quickly depreciating asset, given the current nature of its financing and property taxes that are coming due.

So I will say that the sale of the home is in the best interest of the receivership, and I will approve that sale for -- for completion on the 28th of the month.

I will get to the stay just in a moment.

Personal property.

I view personal property a little bit differently than I view the home itself.

I don't see the personal property as rapidly dissipating in value. And so I don't think I can sign off on the sale of it, because it is not under interest-only financing and property taxes due on it.

I will say that I'm fine moving it into



storage, right? I don't think you need to return it to Barton because I do still think the receivership has a valid claim to it and then we need to adjudicate that at the right point in this case.

I'm not going to order the storage be at Barton's expense yet, but I don't know the cost of the storage and y'all don't either yet. And so that is an issue that we need to keep thinking through.

If we are storing property that's worth $20,000 total and it is cost him $3,000 a month, we need to make a quick determination on that. And then I need Barton to be ready to decide if he wants to shoulder the cost of that. If that property is uniquely personal enough to him to where he would rather pay the storage costs until we can reach a determination, then that needs to be a decision he can make.

Which takes us to a stay. I know there's a request for me to stay my ruling if I grant the motion. I'm granting it, certainly in part, as it relates to the home, not as it relates to the personal property.

I'm going to deny that request. The reason being, I think time is of the essence on this. I think it is -- the closing date is on the

28th. And I think if we push off beyond that, I think we can see an increase in interest rates that's drives an increase in mortgage rates, that drives an increase in the student loan -- student loan -- this mortgage interest-only rate.
So students loans are all the rage of court challenges these days.
So I don't think it's -- I don't think I can grant the motion and also grant the stay. I think it's illogical for me to do that. I can't split the baby like that. I'll ruin the whole thing if I do that.
But I recognize the Fifth Circuit might disagree with me and stay this and shut it down. In which case, we will all abide by whatever they say. So I don't plan on going with your stay. I will deny that request.
Okay. That is all I'm prepared to rule on at this hearing.
Other questions or issues that --
MS. KOONCE: Yes. Your Honor, we have the issue of the lis pendens. That while Mr. Barton contends it is not -- we can still close the sale with lis pendens, our title company begs to differ. So we either need the Court to declare that void or



compel Mr. Barton to sign a release of lien. The release lis pendens. He will have to sign it in front of Notary, but I have a copy here. I can provide it to Mr. Barton's counsel, but we would request that you compel him to sign this by the close of the day and provide it to the Receiver.
THE COURT: Understood.
Okay. We have got the choose-your-own-adventure now.
What I will say is, I do think the lis pendens is void. The question is, will Barton sign it or do I need to declare it void?
Do you need to confer with your client on that basis? We can take a five-minute recess and you talk.
MR. EDNEY: I don't need to confer, your Honor. If you are going to declare it void, we would disagree with that decision, and -- but, you know, obviously, your Honor is set on that path.
So we think the lis pendens is perfectly valid. We are -- we have a pending proceeding before your Honor contesting the Receiver's authority to sell it. This issue is under appeal. It hasn't been resolved by the Fifth Circuit yet.
It won't block the sale. It is not a



lien. It is constructive notice to the buyer that in the event that this proceeding goes in the other direction, either here or in front of the Court of Appeals, that we are going to be coming back for this property.
So it is the buyer's choice. It is not a lien. It is not a legal impediment to sale and it was properly filed.
THE COURT: Understood.
Have you've gotten me a proposed order or can you get me one?
MS. KOONCE: I believe we submitted a proposed order on Friday. I'm happy to submit it again. We have to have something to give to the title company, so that they show it is clear.
THE COURT: Understood.
Okay. And then the last thing I will ask is, can the Receiver order a copy of this, just so I have my findings on the record.
It doesn't have to be expedited, a copy of the transcript of this proceeding.
And then we will find your proposed order from Friday. If we have any trouble locating it, we'll email all counsel and ask for you to reply all to that email.



All right. Anything further for this proceeding?
MR. EDNEY: Yes, your Honor.
Earlier in these proceedings we had a discussion.
THE COURT: Y'all can stay seated, just so I can hear you better.
MR. EDNEY: Okay. Sure. You bet.
Your Honor, earlier in these proceedings, we had a discussion about alternatives to this receivership and the necessity to continue to manage these real estate projects to create value as opposed to liquidating them and the potential for doing that through a monitorship.
And just for a small digression, your Honor, the value in a monitorship here that leaves management in control of these projects, experienced management, driving the projects forward but while preventing sales and other dissipation is that these projects can come to their full fruition for investors and for the lenders that are subject of the SEC complaint.
As your Honor pointed out earlier in this hearing, there will come a point where the Receiver is 100 percent down the road of selling things

because it cannot manage them.

And I would like a hearing before your Honor, sooner rather than later, in the early part of next year, that discusses that fork in the road. Because, you know, I understand your Honor put in the receivership order on the 19th of October. We did not have a hearing then.

You know, this is a pretty focused issue now about -- about whether -- whether -- what the time horizon is on these projects and what is going to be required to maximize their value versus what is appearing to become a liquidation strategy at the receiver level.

And I would just ask your Honor to consider putting a hearing on the schedule to consider that issue.

THE COURT: Understood.

I have hearings on motions, and what I have heard from you is not enough to convince me yet. I would say file a motion with an accompanying request for a hearing, right?

The person in the best position right now to make that argument is Barton. And so make the argument, tell me how much cash it would take. They think it would take a lot more cash than you are



suggesting it would, right? But I need something more concrete and more convincing from you.

But I don't have hearings to have chit-chats. I have hearings on motions, but very specific and concrete, which is why I don't really like motions coming up in responses to replies, right? Don't embed a motion in a response to a reply. File a motion, right? And if I need to get an expedited response, I can get that.

But file your motion, if you want a hearing on it. And we can talk more fully through it. But in your motion, lay out how much cash you think it would take to accomplish the objectives of a monitorship and then we will see what their position is.

MR. EDNEY: Yes, your Honor. We are happy to do that.

We do have a fully briefed motion for stay of the receivership pending appeal that deals with broader issues but -- including this. But if it would help the Court, we would be more than happy to put a targeted motion on file to address this particular issue.

THE COURT: Understood. I will look forward to it.



Okay. Not having anything further, I will go into recess, and I will see y'all at the point we have a hearing on that motion.

MR. EDNEY: Thank you, your Honor.

THE COURT: Thank you.

THE COURT SECURITY OFFICER: All rise.

(Proceedings concluded at 11:03 a.m.)



C E R T I F I C A T E

I, Kelli Ann Willis, RPR, CRR, CSR certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This 30th day of December 2022.

s/ Kelli Ann Willis
Official Court Reporter
The Northern District of Texas
Dallas Division

**$**

**$11,000** 9:7
**$110** 17:4
**$12** 42:9,13
**$20,000** 25:13 26:6 27:1 53:10
**$26** 28:4
**$3** 16:21,25
**$3,000** 53:10
**$600,000** 16:22
**$70** 28:4
**$80,000** 42:11
**$9** 16:24
**$9,000** 9:10

**-**

**-o-** 4:2

**1**

**10** 50:8
**100** 57:25
**11** 18:7
**11:03** 60:7
**12.007** 12:19
**12.008** 12:18
**155** 22:7
**18** 7:20
**19th** 58:6
**1st** 12:13

**2**

**2** 15:25
**20** 51:6 52:5
**2009** 21:2
**2012** 28:21
**2018** 31:3
**2019** 42:9
**20th** 14:8
**24** 29:17
**26** 20:19 48:7
**28th** 52:14 54:1

**3**

**30** 27:22
**30,000-foot** 38:10
**31st** 8:4,8,13 51:11
**3:22-cv-2118** 4:7

**5**

**54** 16:20

**6**

**60** 25:11 49:6

**7**

**7** 17:7,8

**8**

**8** 17:8
**80** 37:16
**83** 19:23

**9**

**9** 51:1
**9.9** 7:18

**A**

**a.m.** 60:7
**abide** 54:15
**ability** 34:7 47:3
**absolutely** 8:17 12:2,17,20 13:9,15 26:18,23 30:24 36:22 43:11 49:7
**access** 8:1 25:2,3,4 48:5,8
**accommodating** 44:20
**accompanying** 58:20
**accomplish** 13:1 40:18 45:25 59:13
**accomplished** 43:6
**accomplishing** 40:11
**accountants** 7:1
**accounting** 42:8
**accountings** 41:23
**accounts** 44:24 48:6,7
**accruing** 7:20,25 9:14
**accumulated** 25:12,15
**achieve** 30:20 33:20
**achieved** 31:11
**achieving** 35:11
**acting** 36:4
**action** 14:20,23 15:25 20:25 23:23
**Adams** 21:2 46:10,12
**add** 35:3
**addition** 10:5 11:11 47:17
**additional** 13:22 44:17 47:9,11,14 49:17
**Additionally** 9:6 42:3
**address** 37:24 38:12 42:23 43:4 59:22
**adjudicate** 53:4
**adjudicated** 23:8
**adjudication** 23:23 26:13
**administered** 30:18
**administration** 26:8
**affect** 34:17
**agent** 39:23
**agree** 44:4
**agreement** 41:10 50:14,21
**allegation** 27:14
**allegations** 14:14 28:23 30:9 36:2 51:24
**alleged** 14:11 24:1 27:11 39:12 46:8
**allegedly** 28:5
**allowed** 48:21
**alluded** 43:12 44:5
**alter** 15:17
**alternative** 9:3 26:11,24 30:20 31:6,22 32:14,16
**alternatives** 23:12 57:10
**analysis** 50:24
**Andrews** 4:17
**apartment** 17:1
**apparent** 25:18
**Apparently** 25:12
**appeal** 24:8,11 26:23 34:17 55:23 59:19
**Appeals** 56:4
**appearances** 4:8
**appearing** 58:12
**appendix** 45:8 47:12
**applicable** 30:24
**applied** 31:3
**apply** 36:20
**appoint** 6:8 46:24,25
**appointed** 45:14
**appointing** 39:22
**appraisal** 16:3
**appraisals** 38:24 44:19
**appraised** 6:15 50:5
**appraisers** 6:8
**approach** 5:14
**approval** 10:10
**approve** 6:7 10:17 34:13 52:14
**approving** 26:25

**argued** 35:12 50:17

**argument** 9:25 24:4 35:20 37:12 46:4,19 58:23,24

**arguments** 17:23 35:18 41:18

**art** 9:20,21 42:9,10,13

**aspects** 17:11 19:22

**assertion** 25:19

**assessment** 8:16

**asset** 27:8 30:1 31:25 32:10 52:3,10

**assets** 10:12 11:19 12:5 15:12 16:9,13,14 19:12 22:2 23:25 25:21 27:17,22 28:2,7 29:3,6,8 30:13,21 32:11 38:16,22,23 39:1,11 40:4 41:3,6,20,24 42:7,18, 19 44:16 48:13,22 49:2,17

**assume** 43:17

**assuming** 24:4

**attack** 26:7

**attempted** 14:14 35:20

**attention** 44:6

**authored** 31:1

**authority** 12:8,16,21 14:18 24:9,15 55:23

**authorize** 14:6

**autopilot** 23:20

**avenues** 18:1 19:6

**aware** 6:1,12,19 10:9 11:5 45:5

B

**baby** 54:11

**back** 22:21 23:11 24:22 25:5 31:18 38:11 46:7 48:4 56:4

**backdrop** 51:8

**bad** 36:10

**bank** 11:22 41:23 44:23,24

**banking** 48:1,4

**bankruptcy** 12:20,25

**banks** 39:19 48:3

**barely** 27:15

**Baron** 28:22 32:18,19

**Barton** 4:7,14,17 8:20 9:11 11:4,13,15 12:6 14:2,7 15:25 16:13 17:10 18:4 20:3 22:10,21 26:18 27:11 28:17 30:7 31:16 36:20 40:24 41:17 42:2,5,10,14 43:11 44:3,21 45:2 47:15 51:21 53:2,12 54:22 55:1, 11 58:23

**Barton's** 8:19 11:8 14:6,25 21:11,20 22:16 23:7 26:5, 12 34:14 35:20 41:12 46:19 53:6 55:4

**basis** 25:18,24 26:1 55:14

**begin** 21:25

**beginning** 47:5

**begs** 54:24

**behalf** 4:10,25

**believed** 20:4

**belong** 25:23

**belongings** 9:21 20:14 42:21

**Bernstein** 4:9,10 35:2,8 36:22 37:3,6

**bet** 37:7 57:8

**big** 17:1

**bit** 9:8 24:18 52:18

**block** 55:25

**briefed** 59:18

**bring** 10:12 32:2 37:22 45:18

**broader** 59:20

**brought** 13:8

**burden** 34:9 49:14

**burdensome** 30:19 31:5

**burned** 50:20

**business** 15:24 16:10 17:9 19:17 20:9,15 21:8 22:10 23:1,15 25:3 27:21, 23 31:10 32:2 33:8

**businesses** 40:21 49:10

**buyer** 56:1

**buyer's** 56:6

C

**candle** 22:20

**capacity** 20:7

**card** 12:4

**Carol** 20:21

**carry** 21:19

**case** 4:6 12:22 14:10 17:7 19:11,24 21:3 28:20 29:25 30:5 31:19 33:19,21 34:10 35:9 36:17 37:2 43:18 46:13,22 53:4 54:15

**cases** 12:20 15:19 20:5 30:24 36:8,14 39:9 46:11

**cash** 6:20,21 7:7 8:23 10:7, 22 15:20 16:12 17:12 18:24 19:2 22:25 37:22 39:3,5 40:4,23 43:7 44:16, 23 49:17 51:12 58:24,25 59:12

**certifications** 7:1,3

**chair** 25:6

**challenges** 54:7

**challenging** 14:16

**charges** 15:3

**Charlene** 4:25

**China** 21:5

**Chinese** 28:18

**chit-chats** 59:4

**choice** 56:6

**choose** 20:6

**choose-your-own-adventure** 55:9

**chose** 20:8 33:18

**Circuit** 21:3 24:13 28:21, 25 34:18 54:13 55:24

**Circuit's** 19:10

**circumstance** 15:10

**circumstances** 15:8

**cited** 12:20

**claim** 43:19 53:3

**claimed** 23:13

**claims** 7:19 14:13 28:19 29:3 43:14,15

**clear** 37:25 56:15

**client** 55:13

**close** 54:23 55:6

**closing** 53:25

**clothing** 25:7

**cloud** 48:11

**Code** 12:18

**collusion** 36:16

**comfortable** 5:24

**commercial** 16:9 17:11 18:1,13,21 19:6 20:10 21:7 22:9 23:3,14 27:24 51:19

**commingled** 49:1

**commingling** 11:23 47:4, 11,18 48:22 51:20,21

**Commission** 20:1

**communication** 9:4

**communications** 9:13 11:6

**companies** 20:19

**company** 29:12,15,16,20 54:24 56:15

**compel** 13:7 55:1,5

**compelling** 35:9

**compels** 48:15

**competent** 35:10

**competently** 28:9

**competing** 5:6,7 6:5,21 7:6 13:18 43:14,15,19 50:7

**complain** 42:17

**complaint** 32:18 57:22

**complaints** 19:13
**completely** 46:16
**completion** 52:14
**complex** 16:21,23 43:12
**complicated** 33:9
**complication** 17:23,24
**comply** 6:13 39:20 41:22 42:15
**complying** 39:23
**concluded** 60:7
**concrete** 59:2,5
**condition** 16:4
**conduct** 46:8
**confer** 55:13,16
**conference** 9:4 10:1,14, 15
**conferred** 12:11 48:17
**confident** 8:5
**confirmation** 11:12 12:25
**connection** 50:12,13
**consent** 16:14 17:12,18
**consented** 17:15
**conserve** 15:12,16,18 37:11
**conserving** 30:20
**constructive** 56:1
**contemplate** 43:25
**contemplated** 13:12
**contends** 7:10 54:23
**contention** 10:2 38:13
**contents** 10:23 11:3,7,9, 25 45:4
**contest** 24:2
**contesting** 55:22
**context** 39:1 46:16
**continue** 7:21 31:15 32:12 38:24 57:11
**continued** 26:12
**continuing** 6:25 12:8
**contract** 6:9 9:13 43:23
**contracts** 43:25
**contradiction** 40:13
**contrary** 27:6
**control** 13:17 16:10 57:17
**controlled** 47:16
**convince** 58:19
**convincing** 59:2
**cooperation** 45:20
**copy** 55:3 56:18,20
**corporate** 22:6
**corporation** 19:17 20:17 21:13 25:21,22
**corporations** 21:1,6 31:12
**correct** 8:6,9,15 24:18
**Cort** 4:25
**cost** 11:8 23:18 26:12 53:6, 10,13
**costs** 53:15
**couch** 14:9 25:6
**counsel** 5:5,18,22 11:6 14:2 34:24 35:20 55:4 56:24
**counsel's** 45:3
**couple** 32:25
**court** 4:3,4,11,18 5:2,16,25 6:10,12,16,19 8:3,7,10,13, 18 10:9,17,25 12:15,21 13:3,10,20,24 14:1,5,22 15:4 16:17 17:15 18:6,12 19:9,20 24:14 26:3,9,24 27:2 29:12,21 32:12 34:20 35:5,23,25 36:24 37:4,7 38:1,5 39:17 41:18 42:16, 25 43:5 45:14,22 46:2,19 49:6,19 54:7,25 55:7 56:3, 9,16 57:6 58:17 59:21,24 60:5,6
**Court's** 11:20 12:8 24:10, 12 25:25 39:23 41:22 42:15 44:9 45:8 46:23 49:16
**Court-appointed** 37:10
**create** 31:15,20 57:12
**credentials** 48:9,10,11
**credit** 12:3
**Creek** 42:4
**criminal** 33:18,21 34:5,9 36:14,21 37:2
**crucial** 23:25
**current** 52:10
**cycle** 32:24

**D**

**Dallas** 51:4
**Dallas/fort** 27:21
**data** 48:12
**date** 44:25 48:24 53:25
**daughter's** 14:9
**David** 28:12 31:9 37:10
**day** 9:19 12:11 15:25 33:19 38:3,5,16 51:21 55:6
**days** 49:6 54:7
**deal** 22:19,22
**dealing** 27:17
**deals** 59:19
**dear** 42:1
**debtor** 12:23
**December** 8:13 12:13
**decide** 53:12
**decision** 20:2 28:22 30:25 31:2 46:23 53:16 55:18
**declaration** 20:22,23 47:5
**declare** 12:16 54:25 55:12, 17
**deduction** 8:14
**default** 7:3,20
**defend** 34:8
**defendant** 13:6 15:14 20:6 30:19 34:5 42:14 45:21 46:15
**defendants** 46:15
**delay** 9:12
**demonstrate** 12:5 47:13
**denied** 13:2 48:8
**deny** 14:22 53:23 54:17
**depend** 28:8
**depreciating** 52:9
**depth** 38:2
**designed** 16:21
**destroy** 28:10
**destroyed** 32:4
**detail** 48:21
**determination** 53:11,16
**develop** 40:9,14
**developed** 37:16
**development** 21:8 22:10 23:14 27:21 28:9 32:3 33:8 38:25 40:25 51:18
**developments** 40:7
**differ** 54:24
**differently** 52:19
**difficult** 29:10 39:16,19
**digression** 57:15
**diminish** 51:5
**dipped** 30:6
**dire** 18:10,13,19,20,23
**direct** 13:5 19:20
**directed** 37:13
**direction** 56:3
**disagree** 54:14 55:18
**disclaimer** 36:6,8
**discovered** 12:11 47:4,7, 10
**discusses** 58:4
**discussion** 38:10 57:5,10
**discussions** 37:13,14
**dish** 25:7
**disingenuous** 42:20

**dispute** 17:5
**disregard** 12:8
**dissipate** 45:24
**dissipating** 52:4,21
**dissipation** 52:3 57:19
**docket** 19:23 45:10
**documents** 14:12
**dollar** 33:4,13
**dozens** 48:3
**drag** 24:20
**drained** 44:23
**drastic** 17:13 23:22 30:19
**drives** 54:3,4
**driving** 57:18
**drop** 52:5
**due** 8:3,8 45:4 51:11 52:8, 11,23
**Duval** 12:22

E

**earlier** 16:3 57:4,9,23
**early** 12:15 58:3
**earth** 27:19
**economic** 51:6
**Edney** 4:15,16,19 14:3,4 15:7 17:16 18:11,22 26:14 27:3 29:19,22 34:21 45:5 55:16 57:3,8 59:16 60:4
**efficient** 51:16
**effort** 19:11 20:21,23 21:9 34:4 44:6
**efforts** 47:24
**email** 11:6 45:6,7 56:24,25
**emails** 44:8
**embed** 59:7
**emergencies** 27:8
**emergency** 30:12 33:24
**eminent** 27:8
**encountered** 7:15
**encumbered** 7:16,17
**encumbrances** 51:18
**end** 31:11 38:16
**engaged** 47:1
**entailed** 24:10
**entered** 41:15
**entities** 11:19 12:1 16:4, 10,11 17:10 22:6,7 23:1 27:23 33:14 42:5 47:14,16 49:2 51:22
**entitlements** 40:15
**entity** 10:11 11:17 21:10 24:25 47:18,19,20 49:8
**entry** 46:20
**equity** 8:2 10:6 16:22,25 17:6 43:14
**erode** 8:2
**essence** 53:24
**essential** 13:15
**estate** 5:12 6:18 13:14 16:9 20:16 21:6,7,8 22:10 23:14 27:20,25 31:10,13 32:23 33:8 37:11,15 43:16 51:14 57:12
**estate's** 7:5
**et al** 4:7
**event** 15:15 30:22 33:22 56:2
**events** 15:11 24:1 32:15
**eventual** 30:22
**evidence** 29:4 30:11 31:24 32:1 35:10 47:2,21 48:25 49:3
**exact** 46:6
**examples** 16:16
**exceed** 6:13
**exceeds** 28:3
**excellent** 9:1
**Exchange** 20:1
**exercise** 22:5 25:2
**existence** 14:17 30:17
**expand** 24:15
**expansion** 24:12
**expedient** 39:13,24
**expedited** 56:20 59:9
**expense** 26:12 53:6
**expenses** 9:15 10:6 19:5
**expensive** 7:2 39:10
**experienced** 31:10 57:17
**explains** 28:20
**explanation** 49:9
**explored** 18:2
**extensive** 11:23 43:13 47:18
**extinguish** 43:15
**extra** 24:14 39:15
**extraordinary** 15:10,19 27:5
**extremely** 23:6
**eye** 28:1

F

**facilitated** 16:13
**fact** 6:14 14:15 17:8 21:15 41:22
**failed** 41:21
**failure** 41:8
**fair** 35:11
**familiar** 26:15
**familiarity** 45:3
**Faulkner** 31:2
**Federal** 51:4
**fees** 19:4
**figure** 18:9
**figures** 17:7,8
**file** 58:20 59:8,10,22
**filed** 5:7 10:10 12:11,12,14, 23 47:10,12 56:8
**filing** 9:3 12:10 28:3 46:22, 25
**filings** 6:20 8:20 11:5 17:22
**final** 34:24 37:8 46:3
**financed** 18:10
**financial** 16:4 25:6
**financing** 18:20,21,23 52:10,23
**find** 15:19 33:16 44:25 48:12 50:7 56:22
**finding** 15:2,5,9,13,15 30:22
**findings** 49:21 50:2 56:19
**fine** 5:21,25 52:25
**fire-selling** 33:12
**firm** 4:17
**Fitzwater** 31:2
**five-minute** 55:14
**flake** 27:13
**flight** 27:8,18 29:2,5 30:1 31:25 32:11
**floor** 51:1
**flow** 22:25
**flush** 46:4
**fly** 30:13
**focus** 16:8 23:13 44:7
**focused** 20:9 58:8
**focuses** 20:2
**focusing** 17:9,10 23:12
**forecast** 51:6
**foreclosed** 21:22
**foreclosure** 51:1
**foreclosures** 41:2,5
**forfeit** 7:4 34:8
**fork** 58:4
**forms** 15:20
**Fort** 17:3
**forward** 7:11,13 32:8,9

57:18 59:25

**found** 19:23 41:11 50:14

**frankly** 17:12 19:7 21:12 41:17 44:17

**fraud** 28:24 39:12

**freeze** 7:23

**Friday** 56:13,23

**Frisco** 16:23 37:21 43:6

**front** 55:3 56:3

**fruition** 38:25 45:18 57:20

**FTC** 39:9

**full** 38:2 44:5,6 57:20

**fully** 59:11,18

**funds** 11:9 20:24 21:4 42:19 46:7 51:23

**furnishings** 11:12

**future** 24:5 37:13

G

**gather** 12:4

**general** 15:11

**generally** 8:7 20:5

**generate** 43:7

**give** 22:21 34:24 56:14

**glass** 25:7

**goal** 39:11,13 40:2

**goals** 30:20

**good** 4:15,24 33:9,10,13

**government** 14:10,12,13 33:17 40:16

**governs** 6:5

**grant** 34:15 53:19 54:9

**granting** 53:20

**ground** 29:9

**guess** 35:14

H

**Hahn** 20:22 47:4

**halfway** 26:20

**hampering** 34:7

**hand** 6:22 28:10

**hands** 44:21

**happen** 10:2,18 30:2 40:19

**happened** 20:16 25:1 47:25 49:4

**happening** 30:3 48:13

**happy** 13:22 35:22 44:13 45:7,12 56:13 59:16,21

**hard** 22:19

**harm** 7:12 14:21

**harmful** 25:16 28:16,17

**hear** 10:25 14:2 32:25 35:6 37:9 38:1 57:7

**heard** 40:10 49:21 58:19

**hearing** 6:4 54:19 57:24 58:2,7,15,21 59:11 60:3

**hearings** 58:18 59:3,4

**heavily** 7:16

**held** 19:16 20:16 43:16

**hey** 12:3

**high** 16:8 17:8 19:18

**higher** 6:15 8:16 21:18 50:9

**highest** 6:10 9:9

**highlighted** 45:10

**highly** 40:22

**hitting** 35:6

**hold** 11:7 20:18 21:11 38:15

**holding** 19:17

**Holdings** 42:8

**holds** 29:17

**home** 14:6,8,25 16:1 18:9 23:23 25:4 34:14 35:4,9,16 36:4,20 37:1,17 46:7 49:24 50:1,12,13,19,22 51:25 52:12,19 53:21

**homes** 52:5

**honest** 39:11

**Honor** 4:9,15,24 12:17 14:4,19,24 15:22,23 17:16 20:11 21:12 22:1,5,12,19 23:2,5,10 24:7,17 25:19 26:2,14 27:3,12 28:7 29:23 30:15 31:7 33:15 34:13,15,16,19 35:2 36:23 37:6 38:18 40:13 41:7 42:14 45:13 46:9 54:21 55:17,19,22 57:3,9,16,23 58:3,5,14 59:16 60:4

**horizon** 58:10

**hour's** 24:23

**hours** 29:17

**house** 8:20 9:22 17:14 18:3 19:8,14,18 20:13 21:20,22 22:18 24:16,24 25:1,8,10,20 26:2,21 49:8

**HUD** 6:25 7:3 23:18

**HUD-BACKED** 17:2

**Huffman** 4:16

**huge** 44:11

**hundred** 38:6

**Hunton** 4:17

I

**identify** 15:12

**illogical** 54:10

**immediately** 7:13 9:24 44:14

**imminent** 27:18 31:24

**impediment** 56:7

**important** 15:23 30:16 32:16,18

**imposition** 31:7

**impossible** 14:21 15:18

**incentive** 31:16

**inception** 46:20

**inclined** 34:15

**including** 59:20

**inconsistent** 29:5

**incorrect** 12:17

**increase** 34:4 54:2,3,4

**increases** 8:17

**increasing** 51:3

**incredibly** 28:16

**incurring** 7:18

**independent** 23:19

**individual** 20:7

**individuals** 19:18

**information** 6:17 12:5 13:22 41:23 42:4 47:9 48:12,20 49:13

**initial** 28:3

**inside** 20:14 21:13

**instance** 6:22 12:10,22 40:7 41:19

**insurance** 6:22 9:15

**intend** 28:11,12

**intent** 43:21

**intercompany** 47:24

**interest** 5:11 6:18 7:4,5,18,19,20,25 9:6 13:14 21:16,19 50:10 51:3 52:13 54:2

**interest-only** 18:7 50:25 52:7,23 54:5

**interests** 5:10 20:10

**intrinsically** 50:17

**invasion** 23:6

**inventory** 41:24 42:10

**investigating** 30:7 33:24

**investigation** 11:24

**investments** 47:6

**investor** 42:19 48:22 49:8

**investors** 31:21 46:14 57:21

**involve** 34:4

**involved** 33:14 39:8

**irrelevant** 39:6

**irreparable** 7:12 14:20

**irreversible** 34:13

**issue** 24:19 26:6 28:5 35:3 39:7 41:3,9,14 43:3 44:11 46:13 51:24 53:8 54:22 55:23 58:8,16 59:23

**issues** 10:8 20:22 22:25 35:19,23 42:23 54:20 59:20

**items** 9:21 41:25

**J**

**January** 8:4,8 51:11

**Janvey** 19:11 21:2 46:6, 10,11,12

**JMJ** 42:8

**judge** 5:13 7:12 10:2 12:7, 25 13:9 19:25 31:1,2

**judgment** 35:14 38:17

**judicial** 51:9,10

**jurisdiction** 24:14

**justification** 22:17,18

**justify** 48:1

**K**

**Keefe** 4:9

**key** 37:18

**kick** 15:25

**kicked** 14:7

**kind** 16:3 23:9 30:12 51:10

**Koonce** 4:24,25 5:2,13,23 6:1 8:5,9,12,15,25 11:2 13:24,25 37:24 38:4,11 43:2,8 46:9 54:21 56:12

**Kurth** 4:17

**L**

**largely** 37:13 38:2,9

**larger** 45:17

**late** 8:17

**launch** 33:18

**law** 4:17 26:1 50:6

**laws** 14:11

**lay** 59:12

**layers** 39:15

**learned** 11:24

**leaves** 57:16

**lecturn** 5:15

**led** 35:12

**left** 31:20 32:21

**legacy** 17:10

**legal** 50:6 56:7

**legitimate** 14:25

**lender** 7:19 19:12 25:21

**lenders** 20:24 21:5 28:6,18 31:18 32:17 57:21

**lending** 23:19

**letters** 43:21

**level** 58:13

**leverage** 36:5

**leveraged** 40:23

**liability** 15:3,5,9,14,15 23:24 24:2 30:22

**lien** 13:8 43:20 55:1 56:1,7

**liens** 43:13 44:11

**life** 25:16

**light** 33:23 34:1

**lights** 22:25 37:23

**limited** 6:20 7:7 10:13

**lining** 17:19

**liquidate** 28:14

**liquidating** 57:13

**liquidation** 14:18 24:9 58:12

**lis** 12:10,16,23 13:1 54:22, 24 55:2,10,20

**listed** 16:2 42:7

**listen** 21:15 25:20

**listing** 41:10 50:14,21

**litigation** 13:2

**live** 21:21

**lived** 11:15

**lives** 25:10

**loan** 7:3,17 9:7 47:19,20 50:25 52:7 54:4,5

**loans** 6:25 18:7 19:12 23:18 47:25 54:6

**locating** 56:23

**location** 9:10

**locations** 17:3

**locker** 26:22

**long** 10:3 29:6

**loss** 23:24 32:11,22

**lot** 9:12 25:12 29:10,11 46:5 58:25

**lots** 16:20

**lovely** 36:11,12

**low** 18:2

**M**

**made** 9:2,25 15:22 20:2 22:15 24:6 26:13 31:3 34:7 36:3 46:5

**Madoffs** 27:9

**main** 33:21

**maintain** 8:23 10:6,12,20 51:13

**maintaining** 13:15

**maintenance** 21:20

**make** 26:3 31:17,19 35:17 41:18 49:20 53:11,17 58:23

**makes** 38:3

**making** 29:10 30:21 32:7 35:18

**man** 25:11 31:9

**man's** 23:23 25:1

**manage** 10:22 28:11 38:22 45:15 57:11 58:1

**managed** 33:6,12 44:22

**management** 16:8 31:14 57:17,18

**managing** 28:8

**mandate** 45:25 49:16

**manner** 13:11 26:7

**market** 41:10

**massive** 32:21 47:12

**materials** 25:4,5 45:21

**matter** 16:5 21:14 42:18

**maturity** 28:9 32:3 33:6

**maximize** 58:11

**meaningful** 17:21

**meant** 33:20

**mechanically** 50:3

**mechanism** 19:7

**meet** 50:8

**meets** 50:5,6

**mention** 16:18

**mic** 35:6

**Michael** 4:16

**microphone** 4:12 5:20

**million** 16:21,24,25 17:4 28:4 42:9,13 46:11

**mind** 35:5 37:12,18

**mindful** 33:15 34:1

**minimum** 6:14

**mobile** 52:2

**moment** 52:16

**money** 39:3,14 42:12 48:25 49:7

**monitor** 32:6 37:10 39:9, 17

**monitorship** 31:8 37:25 38:10,15,22 39:2,6,15 40:1,3,19 41:4 42:24 57:14,16 59:14

**monitorships** 39:8

**month** 52:15 53:10
**monthly** 9:6,9
**months** 43:20 44:1 45:18
**morning** 4:15,24 12:15
**mortgage** 9:15 21:14 54:3, 5
**motion** 5:4 6:7,8 7:8,9 10:1,10 11:2 12:12 19:21 34:16 44:10 45:9 46:25 47:10,13 48:17 53:20 54:9 58:20 59:7,8,10,12,18,22 60:3
**motions** 58:18 59:4,6
**move** 11:9 32:3,8,9
**moved** 26:21
**movers** 24:23
**moving** 9:20 52:25
**multiple** 6:23 11:5

**N**

**named** 46:14
**nature** 18:19,20,23 20:5 29:5 50:22 52:7,10
**navigates** 31:22
**necessarily** 52:2
**necessity** 24:6 57:11
**needed** 23:25 51:12
**negotiations** 6:9
**net** 16:22,24,25 17:6 19:18
**Netsphere** 28:21 29:25 30:15 32:19
**Notary** 55:3
**note** 15:24 50:14
**notice** 5:7 6:2,3 9:20 24:23 51:9,10 56:1
**notwithstanding** 50:11
**number** 17:7
**numbers** 50:3
**numerous** 6:19

**O**

**obedience** 13:10
**objected** 11:4
**objection** 7:9
**objectives** 59:13
**obligation** 10:21
**obligations** 7:7
**observance** 13:10
**observed** 10:5
**obtain** 47:8
**obtaining** 40:15
**occurring** 36:16
**occurs** 39:1
**October** 14:8 58:6
**offer** 6:10 9:1,11,24 10:3 45:3,5 50:9
**offered** 9:5 11:6
**offers** 5:6,8 6:6,11 13:18 16:13 17:3 37:20 50:8
**office** 25:5 41:11 42:4
**OFFICER** 4:3 60:6
**offshore** 52:2
**one's** 25:9
**ongoing** 19:5
**operated** 47:14 49:10
**operation** 20:16
**operations** 15:21 17:9 18:25
**opposed** 9:3 10:16 39:21 43:20 57:13
**opposing** 31:7
**opposition** 19:21
**option** 20:4
**options** 23:16
**order** 8:23 11:18 12:9 13:7, 11,12 15:24 16:20 24:10, 12 25:25 26:3 39:24 40:4 41:15,22 42:15 46:1,20 47:16,25 48:2,14,19 53:5 56:10,13,18,22 58:6
**ordered** 28:23 45:22
**orders** 32:5
**original** 46:8
**originally** 20:20
**oversee** 45:14
**owned** 11:16 25:20,22
**ownership** 43:19

**P**

**pages** 19:25
**paid** 8:1
**papers** 27:14 32:15 35:12, 19
**parallel** 33:18
**part** 44:8 53:20 58:3
**parties** 16:14 39:20 49:22
**passed** 10:4
**path** 55:19
**pay** 6:22 7:2,21,22 8:1,10, 16 11:9 19:4 31:18 40:17, 24 46:7 53:15
**paying** 10:5 38:24 44:18
**pays** 9:14 47:20
**peering** 31:1
**pendens** 12:10,16,23 13:1 54:22,24 55:2,11,20
**pending** 5:3 16:20 24:8 26:22 34:17 55:21 59:19
**pennies** 33:4,12
**people** 8:10 36:10,11 40:17
**percent** 7:18,20 18:7 37:16 38:6 50:8 51:1,6 52:5 57:25
**perfectly** 39:10 55:20
**perform** 49:16
**period** 10:13
**permanent** 14:19,20 34:13
**permissible** 13:9
**permission** 33:2
**permitted** 31:14
**person** 39:22 58:22
**personal** 9:21 17:13 18:4 20:14 22:4,9,13 23:6 24:17,19,21,22 25:9 26:4,7 41:12 42:2,6,21 49:24 50:12,13,17,22 52:17,18, 20 53:14,22
**personally** 20:3 26:15
**perspective** 40:22
**pick** 22:24 36:9
**picks** 36:11
**pickup** 26:4
**piece** 20:12 25:7
**pipes** 7:22
**place** 5:16 9:12,24 22:20 32:5,6 33:10 47:25
**plan** 54:16
**planned** 12:24
**plans** 24:21
**planted** 29:8
**plowed** 21:6
**podium** 5:22
**point** 15:1 16:17 18:8 26:17 34:23 38:8 49:15 53:4 57:24 60:2
**pointed** 57:23
**Ponzi** 27:7,12 38:13
**portable** 27:17
**portfolio** 17:2
**position** 35:15 58:22 59:15
**possession** 9:19 11:20,21 13:17 26:5 50:15
**possibility** 7:11
**possibly** 9:1
**post-judgment** 38:18,20
**potential** 44:1 48:22 52:5 57:13

**potentially** 10:11 24:1 43:15,22 45:24

**power** 22:21

**precedent** 27:6

**precedents** 24:13

**prefer** 5:14 44:7,12

**prefunded** 23:19

**prejudgment** 28:23

**premature** 28:14

**premises** 9:18

**prepared** 54:18

**preparing** 41:14

**present** 32:10

**presented** 13:21 31:23 32:14

**preserve** 39:11 41:5 44:16 45:15,16

**preserving** 41:3

**pressure** 34:4 36:20

**pretty** 58:8

**prevent** 23:24 29:2 30:1

**preventing** 57:19

**prevents** 32:6

**price** 50:4

**prior** 15:2

**problem** 21:21,23 22:16, 22 40:20 41:7

**problems** 31:23

**procedure** 12:19 13:4

**proceed** 13:11 44:14

**proceeding** 36:21 55:21 56:2,21 57:2

**proceedings** 15:2 57:4,9 60:7

**process** 16:15 17:18 40:16

**produced** 14:12

**profitable** 18:16

**prohibited** 31:12

**project** 31:21 37:16

**projects** 21:7 27:25 31:14 32:3,8,9,20,23 57:12,17, 18,20 58:10

**prominent** 27:20

**proof** 15:2 30:3 34:6,9

**properly** 46:14 47:15 56:8

**properties** 6:23 8:23 10:13,21 13:16 17:2 18:6, 13,21,23 23:4 33:2 37:20, 23 40:7,14 41:9 43:5,12 44:4,11,13,17,23 45:4,15, 17,24 51:5,13,15,17,19 52:9

**property** 5:4 6:23,24 7:5, 14,15,24 8:2,3,8 9:9,14,15, 17 10:6 11:3,12,16,25 12:12,18,23 15:5,8,20 16:24 20:12,13,18 22:12 23:7 24:17,19,21,22,25 25:10 26:4,8,18,25 29:16, 17 34:5 37:21 38:24 41:9, 20,25 43:6,18 47:19 49:25 50:15 51:11,17 52:1,4,7,8, 11,17,18,20,23 53:9,13,22 56:5

**proposal** 11:4 26:15 31:6

**proposed** 16:23 19:1 25:13 26:10 56:10,13,22

**proposer** 36:11

**proposition** 18:3 25:25 26:1

**propriety** 34:12

**prosecution** 33:18 36:3,5, 15

**protect** 40:5 49:16

**prove** 14:14 25:5

**provenance** 25:6

**provide** 6:17 12:21 13:22 19:6 41:23 45:22 47:23 48:21 49:12 55:4,6

**provided** 48:14

**public** 29:9

**publish** 6:3

**purchase** 19:13 47:19 49:8

**purchased** 11:13,25 12:6 42:12

**purpose** 11:16 15:1 19:2, 16 20:17 21:10 23:4 29:15

**pursuant** 16:15

**push** 54:1

**put** 9:12,23 20:2,6,20 31:6 32:5,6 34:8 35:8,10 47:24 50:18 58:5 59:22

**putting** 40:15 58:15

### Q

**question** 36:1,7,18 37:5, 18,19 38:3,9 43:10 46:3 55:11

**questions** 34:11 35:23 54:20

**quick** 18:18 46:3 53:11

**Quickbooks** 48:6,7

**quickly** 7:25 29:13 37:21 40:8,11 52:9

**quo** 15:16,17

### R

**rage** 54:6

**raise** 15:20 17:6,11 18:24 19:2 35:20 39:3

**raised** 9:25 17:4

**ran** 51:22

**rapidly** 52:21

**rate** 21:16,19 54:5

**rates** 51:1,3 54:2,3

**ratify** 10:10

**reach** 53:15

**ready** 32:22 33:3 53:12

**real** 16:9 20:15 21:6,7 22:10 23:14 27:20,24 29:16,17 31:10,12 32:23 33:8 37:15 57:12

**reality** 41:8

**reason** 19:15 35:13 53:24

**reasons** 22:1

**receive** 6:5 10:14

**received** 6:10 9:20 11:14 17:20,25 21:4 48:3

**receiver** 4:23 5:1 11:23 14:7,17 15:1,7,12 17:5,17 19:1,3 23:22 24:8,15,20 26:3 28:11,13,23 33:1 34:2 35:8,10 36:9,14,19 39:2,22 40:10 41:15,19 42:17 44:5 46:21,24,25 47:1,7 55:6 56:18 57:24 58:13

**Receiver's** 5:5 6:2 11:21 13:16 14:23 15:24 16:7 18:25 21:23 22:16 25:19 34:16,24 35:14 44:10 45:9 47:13 55:22

**receivers** 15:4 27:4,7

**receivership** 7:5,15 10:7, 20 11:8,18 12:1,9 13:7,12, 14 16:20 19:8,21 20:3,7,21 21:13,25 22:8,14 23:13 24:25 26:8 29:2 30:17,18 31:8 33:20 34:2,12 35:21, 22 37:11,22 38:15,21 39:6, 10 40:20 41:15 43:7,16 46:20 47:16 48:2,14,19 50:11 51:12,14 52:13 53:2 57:11 58:6 59:19

**receiverships** 38:13

**receiving** 45:20,21

**recent** 32:15

**recess** 55:14 60:2

**recognize** 54:13

**recommended** 36:9

**reconsider** 46:19

**record** 4:6 16:16 24:18 30:11,14 44:9 45:8 56:19

**recorded** 29:9

**records** 11:22 25:3 29:9 41:23 48:4

**reference** 6:2

**reflected** 42:9

**refused** 41:22

**regard** 17:1 20:13 21:10 22:6 23:10,11,17 25:2 28:5 31:5 37:16

**reimburse** 23:25

**related** 19:12

**relates** 53:21

**release** 13:8 55:1,2

**relied** 12:18

**relief** 46:15

**remedy** 38:18,20 40:2

**remove** 9:17

**removed** 41:25

**rent** 8:20 50:19

**rental** 9:9

**rents** 9:14

**repeat** 43:10

**replies** 59:6

**reply** 56:24 59:8

**report** 32:12

**request** 10:2 14:5,22 45:3 53:19,23 54:17 55:5 58:21

**requested** 6:16 28:13

**require** 6:25 13:10

**required** 6:4 58:11

**requirements** 6:21 44:20

**requires** 6:13 39:15

**research** 9:8

**reserve** 35:17 51:4

**residence** 21:11 41:13

**residential** 51:5

**resolution** 26:23

**resolved** 55:24

**resort** 16:5,6

**resources** 37:11

**respect** 10:23 39:25 42:21 45:2,5 46:18

**respectfully** 14:24 16:7 45:13

**response** 9:4 10:15 11:10, 14,15 12:2,14 17:21 44:10 45:9,12 59:7,9

**responses** 59:6

**responsible** 23:8 24:3

**rest** 50:24

**result** 36:21

**return** 15:14 26:5,17 53:1

**reverse** 14:21 15:18

**rights** 23:7 35:17

**righty** 5:3 14:1

**rise** 4:3 60:6

**risk** 27:18 29:5 32:10

**road** 40:13 49:11 57:25 58:4

**roads** 40:15

**roughly** 16:2

**route** 13:5

**ruckus** 29:11

**ruin** 54:11

**rule** 51:21 54:18

**rules** 28:22

**ruling** 53:19

**rulings** 49:21

**run** 27:20 32:2

**running** 27:12 31:10

## S

**safe** 26:22

**sake** 24:4

**sale** 5:4 6:3,5,8,12 7:8,10, 12,14 13:11,13,20 14:6,19 15:16 16:2,15,20,24 18:18 19:2 26:25 32:6 34:14 35:3,15 43:5 44:2,4 49:24 50:1,4 51:15,16 52:12,14, 22 54:23 55:25 56:7

**sales** 28:15 31:12 40:11 44:6 57:19

**satisfied** 13:19 31:4 44:15

**scenario** 8:21

**schedule** 58:15

**scheme** 27:12

**schemes** 27:8 38:14

**scope** 35:21 47:15

**seated** 4:5 5:19 57:6

**SEC** 4:7,8,10 20:2,4,8,20, 25 23:12 28:5 29:1,6 30:5, 24 31:2 32:12 33:19,24 34:22 36:18 39:13 41:18 42:17 46:22 47:1,9 51:24 57:22

**SEC's** 19:13,20 27:14 28:3,13,19 29:3 30:4,9 31:9,19 32:17 36:9 49:14

**SEC-APPOINTED** 27:7

**SEC-SOUGHT** 27:4

**Section** 12:18

**securities** 14:11 20:1

**SECURITY** 4:3 60:6

**seeking** 46:24

**segregation** 49:2

**selection** 31:9

**sell** 7:24 11:3 12:12 15:4,8, 20 17:4 18:17 24:15 29:10, 12,16,20 33:2 38:19 41:14 44:12,17,18,19 45:19 55:23

**selling** 14:24,25 17:13 18:3 22:17 57:25

**sense** 38:3

**sentence** 27:15

**separation** 36:13

**servicing** 23:17,18

**set** 28:22 55:19

**settlement** 10:10

**seventh** 52:1

**shifting** 22:18

**shocked** 41:17

**short** 13:13

**shoulder** 53:13

**show** 29:1 32:15 48:18 56:15

**showing** 15:21 23:22 24:5 30:14

**shut** 54:14

**side** 37:2

**sign** 13:7 52:22 55:1,2,5,11

**signed** 41:10

**simple** 13:4

**simply** 38:15

**single** 11:16 39:21 43:13

**sit** 5:18 45:23

**sitting** 5:22

**situation** 28:20 33:16,17 35:14 50:16

**sleeping** 14:8

**small** 57:15

**sober** 16:3

**sold** 25:13 26:19 32:20 33:3,4 35:9 40:8 42:1

**sole** 29:15

**solution** 32:5

**sooner** 58:3

**sophisticated** 32:7

**sought** 20:20

**speak** 42:24 43:23

**speaking** 4:12 5:17 8:7 20:5

**special** 19:16 20:17

**specific** 45:6 49:2 59:5

**specifically** 43:4 48:15

**split** 54:11

**stage** 14:10

**stake** 40:5

**stand** 5:15,19

**standards** 31:3 32:19

**standing** 5:22,24

**standpoint** 50:4 51:16

**Stanfords** 27:9
**start** 46:10
**started** 22:23
**stated** 6:7 44:3
**statement** 42:8
**statements** 12:4
**States** 34:9
**stationary** 27:24
**status** 15:16
**statute** 6:4,13 13:19 15:17 44:20
**stay** 5:18 7:8 13:1 19:21 34:16 41:5 44:10 45:9 49:25 52:16 53:18,19 54:9, 14,16 57:6 59:18
**stayed** 33:21 41:1
**step** 24:14 38:11
**stepped** 41:1
**steps** 34:2
**storage** 26:12,21 53:1,5,7, 15
**store** 11:7,10 26:11 45:4
**storing** 53:9
**straight** 22:25
**straits** 18:10,14
**stranger** 27:1
**strategy** 58:12
**stretch** 27:19
**strong** 50:22
**structured** 40:21
**struggling** 40:24
**stuck** 45:13
**student** 54:4
**students** 54:6
**stuff** 25:12,15
**subject** 6:24 12:24 19:13 20:25 28:19 29:3,7 31:19 32:17 43:13,19,22 44:11 52:2 57:21
**submission** 20:1 30:5
**submit** 20:11 56:13
**submitted** 6:15 44:9 56:12
**substantive** 30:9
**sufficiency** 50:7
**sufficient** 10:12
**suggested** 9:3 36:25
**suggesting** 36:16,19 59:1
**suggestion** 37:9 38:14 39:25
**suggests** 47:22,23
**supervise** 39:16,17,18 40:16
**supervision** 39:16
**support** 45:8 47:2,13
**supposed** 15:12
**surrounding** 34:11
**sustained** 23:21 27:15
**Switzerland** 27:18
**system** 33:5,11

**T**

**table** 5:18,22
**takes** 26:24 29:15 47:18 53:18
**taking** 23:23 34:3,5
**talk** 5:5,10 8:21,24 18:15 26:10 35:1 37:20 49:23 55:15 59:11
**talked** 8:22 23:17
**talking** 31:13 37:15
**targeted** 59:22
**tax** 8:14
**taxes** 7:21 8:3,8 9:16 51:11 52:7,11,23
**Ted** 4:16
**teed** 17:17
**telling** 18:16
**tells** 50:21
**terms** 21:15 32:7 48:21
**test** 50:5,6
**testify** 47:22
**testimony** 47:23
**thing** 26:17 39:21 51:10 54:11 56:17
**things** 25:22 30:8 33:6 57:25
**thinking** 38:7 53:8
**Thomas** 4:25 43:23 45:14 49:16
**thought** 16:15 20:20
**thoughts** 37:9
**threshold** 50:8
**tied** 44:21,22
**time** 6:21 10:3,13 12:3,4 14:16,23 29:15 30:9 40:8 41:21 43:7 47:3,10 53:24 58:10
**timeline** 51:16
**title** 54:24 56:15
**titled** 29:14
**today** 4:22 9:12 13:8,21 14:5 31:1 35:1,12,21 36:1 42:16
**today's** 37:14
**toe** 30:6
**told** 45:23
**top** 24:7 30:15
**total** 53:10
**touch** 41:8
**trace** 19:11 20:23 41:19 42:18,19 47:3
**traced** 25:21
**tracing** 22:2 26:13 46:4,6, 7,13,18 47:1 51:20
**track** 38:6,8
**traditional** 7:17
**transactions** 32:8 48:1
**transcript** 56:21
**transferred** 12:24
**treated** 42:5
**treatment** 17:25
**trier** 14:15
**trouble** 56:23
**true** 8:17 40:25
**turn** 33:21
**turning** 23:11
**Turtle** 42:4
**two-thirds** 6:14 50:5
**type** 23:22 36:15

**U**

**ultimate** 15:13
**unable** 42:18
**uncomfortable** 13:3
**underlying** 14:13 15:3
**undermining** 40:1
**understand** 4:20 8:19 29:22,23 33:8 58:5
**understanding** 40:6 48:6
**Understood** 8:18 27:2 49:19 55:7 56:9,16 58:17 59:24
**undertake** 14:18,23
**undertaking** 22:11
**unique** 20:13
**uniquely** 22:4,8 53:14
**United** 34:9
**unlawful** 46:8
**unlike** 20:19 52:8
**unprecedented** 27:4
**unreasonable** 25:8
**unsecured** 28:18 31:18
**unsympathetic** 41:13
**update** 5:9
**urged** 19:9
**utilities** 7:22

V

**valid** 53:3 55:21

**valuable** 9:21 31:17

**vendors** 40:17

**Venus** 16:21

**versus** 4:7 21:2 28:21 31:2 32:19 46:10,12 58:11

**victims** 24:1 39:12

**view** 15:6 16:7 27:5 35:4 52:18,19

**violated** 13:6

**violations** 14:11 48:18

**void** 12:16 54:25 55:11,12, 17

W

**wait** 45:23

**Wall** 4:21,22

**Wallace** 28:12 31:9 37:10

**wallet** 42:6

**wanted** 40:2 42:23 43:4

**warrant** 9:16

**ways** 17:11

**weather** 7:23

**websites** 48:11

**weeks** 16:2 32:25 45:11

**word** 34:24 37:8

**work** 19:3

**world** 27:10

**worth** 17:3 19:18 22:20 26:6 27:21 42:11 53:9

**wrong** 23:13

**wrongdoing** 23:9 34:6,7

Y

**y'all** 38:7 53:7 57:6 60:2

**year** 8:10 52:6 58:4

**years** 12:1 25:11 27:22 30:7 33:25 40:9,12 45:18

**yesterday** 5:7 30:6

# RECEIVER'S MOTION TO DISMISS

**No. 22-11226**

In the

# United States Court of Appeals

for the

# Fifth Circuit

---

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff – Appellee,*
v.
TIMOTHY BARTON,
*Defendant – Appellant.*

---

From the United States District Court
for the Northern District of Texas
Honorable Brantley Starr, U.S. District Judge
Cause No. 3:22-cv-2118-X

---

**Receiver's Motion to Dismiss**

---

Brown Fox PLLC
Charlene C. Koonce
State Bar No.11672850
8111 Preston Road, Suite 300
Dallas, TX 75225
T: (214) 327-5000
F: (214) 327-5001
charlene@brownfoxlaw.com

*Counsel for Receiver Cortney C. Thomas*

## I. INTRODUCTION

On December 21, 2022, Appellant Timothy Barton filed a notice of appeal of the Order Granting Receiver's Motion for sale of the Rock Creek Property (the "Order"). No appellate jurisdiction exists for an interlocutory appeal of this Order and the Receiver accordingly moves the Court to dismiss this appeal. In support, he respectfully shows the Court as follows:

## II. BACKGROUND

The SEC filed suit against Barton for securities fraud. Dkt.1[1] Through its investigation, the SEC discovered "Barton had been commingling, transferring, dissipating, and encumbering investor funds and assets purchased with investor funds," while at the same time using investor funds to "pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane." Dkt. 6 at 2, 7. To preserve the limited assets available to repay the investors whose funds Barton had misappropriated, the SEC filed a Motion for Appointment of Receiver ("Motion to Appoint"). Dkt. 6.[2]

On October 18, 2022, the District Court entered the Order Appointing Receiver ("Receivership Order") Dkt. 29. The factual basis for the Receivership

---

[1] References to the District Court's docket are referenced above as "Dkt._."

[2] Barton was also indicted on seven counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of securities fraud due to his alleged misuse of over $26 million acquired from investors.

Order was Barton's misappropriation of investor funds, which the SEC's evidence demonstrated he misused to, "among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle." Dkt. 6 at 1; Dkt. 7 at 10–15.

The Receivership Order directs the Receiver to "[e]nter into and cancel contracts . . . as the Receiver deems necessary or advisable" and "[t]o pursue, resist, defend, compromise or otherwise dispose of all . . . claims[] and demands which may now be pending or which may be brought by or asserted against the Receivership Entities." Receivership Order ¶¶ 6(H), 6(J). In accordance with the further orders and governing statutes, such as 28 U.S.C. §§ 2001 and 2004, the Receivership Order also authorized the Receiver to sell real property owned by the Receivership Entities. Receivership Order ¶ 39.

On December 2, 2022, in accordance with 28 U.S.C. § 2001, the Receivership Order, and a subsequent Order Governing Administration of Receivership Estate, (Dkt. 63)[3] the Receiver filed a Motion for Appointment of Appraisers, Approval of

[3] "Sale of Real Property, if any, shall be made pursuant to 28 U.S.C. § 2001 with further motions and notices filed and published as required by that statute. If multiple offers are received from disinterested purchasers for any one property, the Court hereby concludes that the Receiver may, in his discretion, utilize any one or more of such offers as one or more of the "appraisals" required by § 2001(b). Similarly, the Receiver may in his discretion utilize informal "opinions of value" received from respected brokers in the respective industries related to the subject property, as one or more of the "appraisals" required by § 2001(b)." Order Governing Administration of Receivership Estate ¶ (D)(2).

Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property ("Motion to Approve Sale"). Dkt. 76. Following an objection filed by Defendant Barton (Dkt. 91), the Receiver's Notice of Publication regarding the sale (Dkt. 100, 101) and the Receiver's Reply in Support of the Motion, (Dkt. 93), the District Court granted the Motion to Approve Sale, in part, by appointing the appraisers and accepting the appraisals submitted with the Motion to Approve Sale. Dkt.99. On December 19, 2022, the District Court conducted a hearing to consider approving the sale. Following the hearing, on December 20, 2022, the District Court entered an order approving the sale (Dkt. 104) (the "Rock Creek Order"). True and correct copies of the Motion to Approve Sale and the Rock Creek Order are attached to this Motion.

On December 21, 2022, Barton filed a notice of appeal, seeking this Court's review of the Rock Creek Order. Dkt. 108. No jurisdiction exists for the appeal.

## III. <u>ARGUMENT</u>

"Congress has given the courts of appeals jurisdiction over interlocutory appeals only in certain, limited circumstances." *Complaint of Ingram Towing Co.*, 59 F.3d 513, 515 (5th Cir. 1995). The exceptions are found at 28 U.S.C. § 1292,[4]

[4] "(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court; (2) Interlocutory orders appointing receivers, or

with section 1292(a)(2) governing appeals of certain orders related to receiverships. Although the statue is not a model of clarity, it does not provide appellate jurisdiction "mid-stream" orders issued in the ordinary course of a receivership, like the Rock Creek Order.

"Courts narrowly construe § 1292(a)(2) 'to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.'" *US v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (quoting *In re Pressman-Gutman Co.*, 459 F.3d 383, 393 (3d Cir. 2006)). Every circuit to address the meaning of § 1292(a)(2)'s 'refusing orders' interprets it to "permit[ ] appeals only from orders 'refusing . . . to take steps to accomplish the purposes of [winding up receiverships].'" *Netsphere, Inc. v. Baron*, 799 F.3d 327, 331-32 (5th Cir. 2015) (quoting *SEC v. Am. Principals Holdings, Inc.*, 817 F.2d 1349 (9th Cir. 1987)) (brackets in original).[5]

refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property; (3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a).

[5] Indeed, although not explicit, *Netsphere* indicates that sales of property by a receiver are not appealable under 28 U.S.C. § 1292. "In *United States v. "A" Manufacturing Co., Inc.*, we addressed the question of whether an order by a receiver confirming a sale after the fact is appealable under section 1292(a)(2). We said it was, relying mainly on cases interpreting the final-judgment doctrine. But in doing so, we used expansive language to describe section 1292(a)(2), saying it 'provides for appeals from interlocutory orders which take steps to accomplish the

Because of the exceptional nature of the relief, Congress made orders appointing receivers immediately appealable. *Netsphere*, 799 F.3d at 332. However, orders "entered in the normal course of a receivership," are treated differently. *Id.* As recently observed by the Eleventh Circuit, the difference between 28 U.S.C. §§ 1292(a)(2) and 1292(a)(1) reveals the different treatment afforded interlocutory appeals of orders related to injunctions and orders related to receiverships:

> "That provision [1292(a)(1)] more broadly confers jurisdiction over orders 'granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.' 28 U.S.C. § 1292(a)(1). It thereby expressly authorizes immediate appeals not only of front- and back-end orders 'granting,' 'refusing,' or 'dissolving' injunctions, but also of mid-stream orders 'continuing,' 'modifying,' or 'refusing to dissolve or modify' them. The contrast is unmistakable. Had Congress wanted to authorize the same robust interlocutory appellate review of interim receivership-related orders, it could have included similar language in § 1292(a)(2). It didn't, and its decision in that respect is 'telling.'"

*SEC v. Complete Bus. Sols. Group, Inc.*, 44 F.4th 1326, 1331–32 (11th Cir. 2022).

"To conclude otherwise would mean that virtually any order of the receiver within the scope of its jurisdiction would be potentially appealable. Such a piecemeal approach to the appellate process would be disruptive and costly, both to the parties and the courts." *Id.* at 332–33 (internal quotation omitted); *see also United States v.*

purpose of receiverships such as directing the sale or disposal of property.' This language arguably conflicts with the reading of section 1292(a)(2) we have just put forward." *Netsphere, Inc. v. Baron*, 799 F.3d 327, 333 (5th Cir. 2015) (internal citation omitted).

*Antiques Ltd. P'ship*, 760 F.3d 668, 671–72 (7th Cir. 2014) (concluding no jurisdiction existed over order approving receiver's sale of property, because "that would both strain the statutory language and make anything the receiver did appealable immediately, which could flood the courts of appeals with interlocutory appeals."). This Court found it lacked jurisdiction over other orders issued in the course of a receivership, such as orders authorizing the execution of a lease by a receiver.[6]

The Rock Creek Order does not fall within any of the three discrete categories of orders for which interlocutory jurisdiction exists. The Rock Creek Order approves a purely administrative matter, the sale of real estate. Approvals of other similar sales are likewise pending before the District Court. *See* Dkt.110. More will be filed. Entertaining this appeal will open the flood gates in this case, and in future receiverships, for Defendant Barton to appeal *every single administrative order*. Indeed, Defendant Barton has indicated his intent to do just that, by appealing the Order Governing Administration of Receivership Estate in Appeal No. 22-11132, and appealing an Order Ratifying a Settlement Agreement, Dkt. 109, in Appeal No. 22-11242.

The Court should dismiss this appeal.

[6] *See Belleair Hotel Co. v. Mabry*, 109 F.2d 390, 391 (5th Cir. 1940) ("The order appealed from dealt with an administrative matter within the discretion of the district court, and it does not fall within that class of interlocutory orders from which an appeal may be taken.").

## IV. CONCLUSION

The Receiver respectfully requests that the Court dismiss this appeal for lack of jurisdiction and requests such other relief to which he may show himself entitled.

Respectfully submitted,

By: */s/ Charlene C. Koonce*

Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

**CERTIFICATE OF COMPLIANCE**

1. I certify that this Motion complies with the type-volume limit of FED. R. APP. P. 21(d) because, excluding the words that need not be counted, it contains 1,697 words.

2. This Motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 365 in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

*/s/ Charlene Koonce*
Charlene Koonce

**CERTIFICATE UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I certify that (1) required privacy redactions have been made (see Local Rule 25.2.13); (2) the electronic submission is an exact copy of the paper document (*see* Local Rule 25.2.1); and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Charlene Koonce*
Charlene Koonce

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| ***Plaintiff,*** | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| ***Defendants,*** | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| ***Relief Defendants.*** | § | |

**RECEIVER'S MOTION FOR APPOINTMENT OF APPRAISERS, APPROVAL OF APPRAISALS OF ROCK CREEK PROPERTY, AND SETTING HEARING REGARDING APPROVAL OF SALE OF ROCK CREEK PROPERTY**

Cort Thomas, as the court appointed Receiver, respectfully moves the Court as follows:

## SUMMARY

In compliance with the Court's Order Appointing Receiver (the "Receivership Order") and 28 U.S.C. § 2001, the Receiver requests appointment of three appraisers, approval of the appraisals, and a hearing regarding approval of the sale of certain property.

## FACTUAL SUMMARY

1. On October 18, 2022, the Court entered an Order Appointing Receiver (the "Receivership Order") by which Cortney C. Thomas was appointed as Receiver for certain entities (the "Receivership Entities"). The Court directed the Receiver to take possession and control of all Receivership Property and Receivership Records. *Receivership Order* ¶¶ 6, 16, 17.

2. On November 16, 2022, the Court entered the Order Governing the Administration of the Receivership ("Administrative Order") which also established procedures in conformity 28 U.S.C. § 2001[1] for sales of real property.

3. In a Supplemental Order, the Court concluded that SF Rock Creek, LLC is a "Receivership Entity." [Dkt. 62].

4. Pursuant to the Receivership Order and in accordance with the Administrative Order, the Receiver listed 4107 Rock Creek Drive, Dallas, Texas 75204 (the "Property") for sale through Dan Rhodes of The Rhodes Group at Compass. (In the initial days of his appointment, the Receiver discovered that Defendant Barton, through SF Rock Creek, had also entered a listing

[1] "(a) Any realty or interest therein sold under any order or decree of any court of the United States shall be sold as a whole or in separate parcels at public sale at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs. Property in the possession of a receiver or receivers appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish, or city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts. (b) After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale. 28 U.S.C.A. § 2001.

agreement on October 17, 2022 related to the Property). *See* Declaration of Cort Thomas ("Thomas Dec.") included in the Appendix at pp. 1-3.

**A. SALE OF ROCK CREEK PROPERTY**

5. On November 16, 2022, subject to the Court's approval, the Receiver entered into a contract to sell the Property, "AS IS" for One Million Four Hundred Thousand Dollars ($1,400,000), to JNJ Group, LLC. A true and correct copy of the real estate contract is attached as Exhibit A (the "Contract"). *App.* pp. 5-22. JNJ Group, LLC is not related to, nor controlled by any of the parties to this lawsuit, and is not related to, nor controlled by the Receiver, or any of his agents, employees, or attorneys.[2] *Thomas Dec.* ¶ 3; *App.* p. 1.

6. Subject to the Court's approval, the closing is scheduled for December 28, 2022. Although the closing date may be extended by mutual agreement, if the buyer does not consent to extend the sale, the Buyer is entitled to terminate the Contract and receive a full refund of his $15,000 earnest money deposit. *Thomas Dec.,* ¶ 5; *App.* pp. 1; 17; 22.

7. The Receiver seeks permission from this Court to sell the Property pursuant to the Contract, and in accordance with the Administration Order and 28 U.S.C. § 2001.

8. In accordance with this Court's Orders and 28 U.S.C. § 2001 the Receiver obtained three independent appraisals of the Property. True and correct copies of the three appraisals are included in the Appendix as Exhibits B-1, B-2, and B-3. *App.* pp. 23-43; 44-70; and 71-94. The Receiver requests that the Court appoint the appraisers for the purpose of providing the attached appraisals and accept these three appraisals in satisfaction of the requirements of 28 U.S.C. § 2001(b).

---

[2] While the entity purchasing the Property has a trade name similar to Receivership Entity JMJ Development, the Receiver has confirmed that the entities are not related. *Thomas Dec.,* ¶

9. The three appraisals value the Property at $1,385,000,[3] $1,385,000,[4] and $1,410,000,[5] respectively, resulting in an average appraised value of $1,393,333. Thus, the contracted sales price, $1,400,000, not only exceeds two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b), but in fact exceeds the average appraised value. Accordingly, the Receiver contends the sale of the Property pursuant to the Contract at the sales price of $1,400,000 is in the best interest of the receivership and exceeds two-thirds of the average appraised value.

10. In connection with a different motion, Defendant Timothy Barton submitted a redacted appraisal from June 2022 performed by Garvin Appraisals LLC, which used a cost approach to value the property at $2,061,228. The Receiver believes that the sale of the Property pursuant to the Contract at the sales price of $1,400,000 is nevertheless in the best interest of the Receivership because (1) Barton's appraisal does not use the correct valuation methodology;[6] (2) despite the Property being on the market for several weeks and receiving multiple offers, the negotiated sales price of $1,400,000 was the highest offer received, indicating that market conditions are consistent with the Receiver's appraisers' valuations of the Property; (3) even if Barton's appraisal of $2,061,228 were accurate, and the Receiver was able to obtain two additional independent appraisals that applied a correct methodology and arrived at the same value, a sale for $1,400,000 would still be authorized under 28 U.S.C. § 2001 because the price exceeds the 2/3 minimum ($1,374,152); and (4) if the value of the Property is as high as Barton contends, pursuant

---

[3] The appraisal was issued by Matthew Waldron and is dated as of November 29, 2022. *App.* pp. 23-43.

[4] The appraisal was issued by Bryan S. Hagen and is dated as of November 17, 2022. *App.* pp. 44-70.

[5] The appraisal was issued by Mark V. Milliorn and is dated as of November 18, 2022. *App.* pp. 71-94.

[6] As reflected in each of the three appraisals submitted with this Motion, real estate appraisals for residential properties usually value properties based on a sales comparison or market approach, not a cost approach.

to 28 U.S.C. § 2001, another bona-fide independent buyer can purchase the property by submitting a bona fide offer exceeding $1,540,000. *Thomas Dec.,* ¶¶ 11; *App.* pp. 2.

11. Finally, while Barton has insisted that the Receiver should not sell the Property at this time, the sale is necessary because, among other things, (1) utility and insurance payments continue to deplete whatever value exists in the home, (2) loan and interest payments continue to accrue, further depleting any recovery from sale of the Property, (3) the administrative costs of the Receivership incrementally increase with each managed property, and (4) current economic uncertainty makes it impossible to predict how difficult it will be to sell the Property in the coming months. *Thomas Dec.,* ¶¶ 12; *App.* p. 3.

**B. NOTICE OF SALE AND REQUIRED HEARING**

12. The governing statute, 28 U.S.C. § 2001, also requires that the Court conduct a hearing to consider the proposed sale. And, at least ten days before the hearing, the statute requires publication of the terms of the proposed sale so that bona fide interested purchasers can submit competing bids of not less than 10% more than the Contract price. Any competing offers should be accompanied by proof of funds for a cash sale, or confirmation of approved financing to allow an immediate closing on the same "AS IS" basis provided in the Contract.

13. The Receiver accordingly requests that the Court schedule a hearing before December 28, 2022 to consider the sale. The Receiver will publish notice of the hearing at least ten (10) days prior to the hearing as required by 28 U.S.C. § 2001(b) and provide notice of the hearing through the receivership website.

14. The Receiver requests that any bona fide offers for purchase of the Property which exceed by ten percent (10%) the Contract sales price of $1,400,000 be served on the Receiver and filed with the Court not later than two days before the hearing scheduled to consider the sale.

**CONCLUSION AND PRAYER**

As set forth above, the Receiver requests that the Court (1) appoint the three appraisers identified above and in the appraisals included in the Appendix, (2) approve and accept the appraisals provided by each appraiser; (3) set this matter for hearing to consider approval of the sale on the terms provided by the Contract or as offered in any bona fide competing offer received after the date of this Motion; and, (4) provided no timely bona fide offers exceeding the Contract price by 10% are received two days before the date of the hearing, enter an order authorizing the Receiver to sell the Property pursuant to the terms of the Contract. The Receiver also requests such other and further relief to which he is justly entitled.

Respectfully submitted,

By: */s/ Charlene C. Koonce*
Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that on December 1, 2022, the Receiver conferred with counsel for all parties regarding the relief requested in this Motion. The SEC and Defendant Fu are unopposed to the relief requested herein. As of the date and time of filing, Defendant Barton had not responded to the conference on this Motion, but the Receiver presumes he is opposed. Defendant Wall also did not respond to the conference.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| ***Plaintiff,*** | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| ***Defendants,*** | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| ***Relief Defendants.*** | § | |

**ORDER APPOINTING APPRAISERS, APPROVING APPRAISALS, AND SETTING HEARING REGARDING APPROVAL OF SALE OF ROCK CREEK PROPERTY**

Before the Court is the Receiver's Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property (the "Motion"). Having considered the Motion, the Court is of the opinion that it should be GRANTED.

Accordingly, it is hereby ORDERED that pursuant to 28 U.S.C. § 2001(b) the Court appoints the three appraisers identified in Exhibits B-1, B-2, and B-3 submitted in support of the

Motion as qualified disinterested persons for appraisal of the Property. The Court further ACCEPTS the three appraisals submitted in Exhibits B-1, B-2, and B-3 as the appraisals required by 28 U.S.C. § 2001(b).

IT IS FURTHER ORDERED that on ____________________, 2022, at _____ a.m./p.m., the Court will hear arguments and objections regarding confirmation of the sale of the Property pursuant to the Contract submitted with the Motion. The Court's consideration of the sale will be contingent on the Receiver publicizing the terms of the proposed sale prior to the hearing and providing a ten-day window following publication in which anyone objecting to the proposed sale may submit to the Receiver a bona fide offer for the purchase of the Property exceeding the proposed sale price by at least ten percent (10%).

Any such bona fide offer SHALL BE accompanied by proof of sufficient funds for a cash sale, or confirmation of approved financing to allow an immediate closing on the same "AS IS" basis for the in the Contract submitted with the Motion. Further, any bona fide offers for purchase of the Property which exceed by ten percent (10%) the Contract sales price of $1,400,000 SHALL BE served on the Receiver and filed with the Court not later than two days before the hearing.

SO ORDERED this ______ day of ___________________, 2022.

______________________________________
BRANTLEY STARR
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants*,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants*. | § § § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 3:22-CV-2118-X |

**ORDER GRANTING MOTION TO APPROVE SALE**

Before the Court is the Receiver's motion to approve the sale of property at 4109 Rock Creek Drive, Dallas, Texas 75402 (the "Property") [Doc. No. 76] and Defendant Timothy Barton's cross-motion to prohibit that sale [Doc. No. 91]. Also before the Court is the Receiver's Motion to Declare Lis Pendens Void. [Doc. No. 96].

At the conclusion of the hearing before the Court yesterday, and for the reasons stated at the hearing, the Court made the following findings. First, the proposed sale satisfies all statutory requirements: the Receiver published notice of the sale,[1] the proposed sale price exceeds two-thirds of the appraised value, and the Receiver received no competing offers.[2] Second, the proposed sale is in the best interest of the Receivership. And third, Barton's Notice of Lis Pendens on the Property is void and, as defense counsel acknowledged during the hearing, it would not have encumbered the sale even if it were not.

In light of these findings, the Court **GRANTS** the Receiver's motion for sale of the Property [Doc. No. 76] and **DENIES** Barton's motion to prohibit the sale [Doc. No. 91]. The Court **GRANTS** the Receiver's motion to declare the lis pendens void and **ORDERS** Barton to pay, within three days of this Order, $1,200 to the Receiver for fees incurred in opposing the lis pendens. [Doc. No. 96]. During the hearing, defense counsel made an oral motion to stay the sale of the Property should the Court find that selling it is in the Receivership's best interest. For the reasons stated at the hearing, the Court **DENIES** that oral motion.

Finally, as discussed at the hearing, the Court **ORDERS** the Receiver to remove Barton's personal items[3] from the Property before the Property is sold, and to place them in storage at the expense of the receivership estate. If storage expenses cause the personal items to rapidly deteriorate in value when compared to the cost of

---

[1] *See* Doc. No. 100.

[2] 28 U.S.C. § 2001(b).

[3] *See* Doc. No. 89 at 2 (detailing the items).

the storage, the Receiver may seek Court approval to sell the items, and Barton must notify the Court in response if he will pay the storage costs to avoid a sale.

**IT IS SO ORDERED,** this 20th day of December, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE